[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 00-13125 & 00-14549

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 09, 2002
THOMAS K. KAHN
CLERK

D. C. Docket No. 99-CR-306-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID EARL WATTLETON,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(July 9, 2002)**


Before ANDERSON, HULL and KENNEDY[*], Circuit Judges.

HULL, Circuit Judge:

The defendant Wattleton was indicted for making bomb threats, in violation

of 18 U.S.C. § 844(e), and the jury rendered an insanity verdict.  At a post-verdict

_____

[*]Honorable Cornelia J. Kennedy, U.S. Circuit Judge for the Sixth Circuit,
sitting by designation.

hearing pursuant to 18 U.S.C. § 4243(d), the district court determined that Wattleton was not eligible for release. On appeal, Wattleton contends (1) that the government impermissibly imposed the insanity defense on him at trial, (2) that § 4243(d)'s placing the burden of proof on the insanity acquittee at the post-verdict hearing violates his due process rights, and (3) that the court erred in denying Wattleton's release. After review and oral argument, we affirm both the jury's verdict and the court's release decision.

## I. FACTS

### A. Offense Conduct

On May 27, 1999, Bill Jones, the president of U.S. Motivation, fired the defendant Wattleton from his sales position. Upset by the news, Wattleton hit Jones and another employee. That evening, Wattleton made several threatening telephone calls. He left a message on U.S. Motivation's voice mail system, threatening to blow up its building and kill Jones and his family. Wattleton also left a message on the home answering machine of Ralph Quinn, a U.S. Motivation supervisor, threatening to kill Quinn and his family. Concerned by these calls, Jones, Quinn, and their families left their respective residences that evening and called police.

2

The next day, May 28th, Wattleton made threatening telephone calls to numerous businesses, including AirTran Airlines, Northwest Airlines, and Home Depot. During each call, Wattleton stated his name, spelled his last name, identified himself as a U.S. Motivation employee, and provided a U.S. Motivation telephone number. In his telephone calls to the airlines, Wattleton stated there was a bomb on one of the planes without identifying a specific flight. In his Home Depot message, Wattleton threatened to kill two named Home Depot employees and to blow up a store every hour until Wattleton got the "police off his back."

Later that day, FBI agents arrested Wattleton for making telephonic bomb threats. Wattleton told an FBI agent, "I've been waiting here all day for you guys." Wattleton subsequently confessed and explained that he had made these threats to prompt an investigation into the conspiracy of police harassment against him. At one point, however, Wattleton indicated that he had made the calls out of revenge against his former employer, U.S. Motivation.

**B.    Wattleton's Notice of His Insanity Defense**

Wattleton was indicted on one count of making a telephonic threat and conveying false information concerning an attempt to unlawfully damage and destroy property by means of fire or explosives, in violation of 18 U.S.C. § 844(e). The remaining three counts charged Wattleton with making telephonic threats to

kill, injure, or intimidate persons, in violation of 18 U.S.C. § 844(e). After pleading not guilty, Wattleton provided notice of his insanity defense, pursuant to Federal Rule of Criminal Procedure 12.2. That pre-trial notice, which was never withdrawn, advised that Wattleton intended to rely on the insanity defense and to introduce related expert testimony.[1]

Consequently, Dr. Artigues, for the government, and Dr. Rand, for the defendant, conducted psychiatric examinations of Wattleton. Both experts concluded that Wattleton suffered from a delusional disorder of a persecutory type that impaired his ability to appreciate the nature, quality, or wrongfulness of his behavior. Specifically, Wattleton believed that the police were harassing him by gathering information about his past mental history and his small genitalia and then sharing this information with his employers who, in turn, would fire him.

---

[1] The Rule 12.2 notice provided:

Comes now Defendant, DAVID EARL WATTLETON, by and through undersigned counsel, who, pursuant to the Federal Rules of Criminal Procedure, Rule 12.2(a), provides this notice to the government that Defendant intends to rely upon the defense of insanity at the time of the alleged offense.

In addition, pursuant to the Federal Rules of Criminal Procedure, Rule 12.2(b), Mr. Wattleton provides this notice to the government that he intends to introduce and use expert testimony relating to a mental disease or defect of any other mental condition to the Defendant bearing upon the issue of guilt.

After these examinations, the district court granted a joint motion for continuance so that the parties would have additional time to explore plea options. The court noted that "[t]his case is unusual in that both parties' experts have found the defendant was suffering from a severe mental illness which impaired his ability to appreciate the nature, quality, or wrongfulness of his behavior." The medical experts' conclusions tracked the definition of insanity: "[A]t the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a).[2] Thus, both experts, in effect, agreed Wattleton was legally insane at the time of his offense conduct. However, both experts also determined that Wattleton was competent to stand trial.

As a result, the government filed a motion informing the court that if the defendant was found competent to stand trial, the government would move for a

---

[2]18 U.S.C. § 17 provides:
    (a) **Affirmative Defense**.– It is an affirmative defense to prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
    (b) **Burden of proof** – The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

"not guilty only by reason of insanity verdict, pursuant to 18 U.S.C. § 4242(b)."

On June 5, 2000, the district court held a hearing regarding Wattleton's

competency and concluded that he was competent to stand trial. In so doing, the

district court considered the medical experts' evaluations and questioned Wattleton

about his understanding of the legal process. Wattleton's jury trial then

commenced on that day.

## C.    Opening Statements

In its opening statement, the government acknowledged that to obtain an

insanity verdict it would have to prove first that Wattleton was guilty of the

charged offenses. Thus, the government described how Wattleton was guilty of

making the threatening calls. The government then described Wattleton's

delusional disorder and how the jury would hear doctors' testimony. The

government proposed that the appropriate verdict was not guilty only by reason of

insanity.[3] Defense counsel did not object to the government's intent to present

_____

[3]In proposing an insanity verdict, the prosecutor stated:
So while the evidence will clearly establish that Mr. Wattleton is
guilty and committed the threats at issue in this case, you'll also have
another option when you return to the jury room, and that option is to
return a verdict of not guilty, but only by reason of insanity. And in
making your decision, you'll have to factor in the doctor's testimony
that you hear and make a determination as to whether Mr. Wattleton
was operating under a delusional belief that clouded his ability to
understand what he was doing and fully the wrongfulness of his

6

insanity evidence or to any part of its opening statement. Thus, even the government was conceding insanity and requesting an insanity verdict. This gave the defense the opportunity to focus more on the threshold issue of whether Wattleton was guilty of the charged offenses.

In his opening statement, defense counsel first described the progression of Wattleton's delusional disorder, its impact on his behavior, and how Wattleton believed that U.S. Motivation's firing him was the "culmination of the police conspiracy" after which physical harm from the police was imminent. Defense counsel specifically proposed that the jury may have to decide between the verdicts of not guilty by reason of insanity and not guilty. Defense counsel indicated that he thought the government may argue that Wattleton was not guilty only by reason of insanity. Again, defense counsel did not object to the government's arguing for an insanity verdict but acknowledged the government may do so. Defense counsel, however, stated that he would argue for a not guilty verdict because Wattleton lacked the necessary criminal intent for the charged offenses.

---

actions.
So it's going to be a somewhat different case, but you as jurors will still be charged with the responsibility of returning the appropriate verdict in this case, and the government submits it's not guilty by reason of insanity.

7

**D.    Government's Evidence**

The government's witnesses testified about Wattleton's threatening calls and related events.[4]   The government then called forensic psychiatrist, Dr. Artigues, to testify about Wattleton's mental condition at the time of the calls. Specifically, Dr. Artigues testified that Wattleton had a delusional disorder of the persecutory type.   Dr. Artigues explained that individuals with delusional disorder "may have a system of beliefs that reflects the fact that they are not in touch with reality";  in other words, they have a "system of beliefs that are true for them, definitely, but wouldn't be true for anyone else."   Since delusional disorder may affect an individual's belief system, the disorder, in turn, can influence an individual's behavior.

Dr. Artigues concluded that Wattleton had made the threats as a result of his delusional belief system.  Dr. Artigues testified that Wattleton wanted to be arrested by the FBI so that he could draw attention to the conspiracy of police harassment against him.  Wattleton believed that police in three different cities were conspiring to spread information about his small genitalia and mental health

---

[4]Because Wattleton does not dispute that he made the threatening calls, we need not summarize the testimony about his offense conduct.

history to his employers so that he would be treated differently and ultimately fired.  Defense counsel did not object to any of Dr. Artigues's testimony.[5]

Indeed, on cross-examination, defense counsel went further and had Dr. Artigues testify or reiterate (a) that Wattleton was suffering from a severe mental disease or defect, and (b) that his severe mental disease or defect impaired his ability to understand the nature and quality of his behavior at the time of the offense.  Dr. Artigues acknowledged that in his pre-trial report he had concluded that Wattleton was not criminally responsible for the charged offenses because of his delusional disorder.

## E.    Defendant's Rule 29 Motion

When the government rested, defense counsel moved for judgment of acquittal under Federal Rule of Criminal Procedure 29.  At this juncture, there was still no objection to the government's insanity evidence or its request for an insanity verdict.  The only Rule 29 argument that related to Wattleton's mental state was that there was no case or controversy about guilt.  Defense counsel stated briefly: "The government has told the jury during its opening statement that they

---

[5] The defense filed two pre-trial motions in limine, but these motions also did not seek to exclude or object in any way to the government's use of Dr. Artigues's expert testimony regarding Wattleton's insanity at the time of his offenses.

are planning to ask the jury to return a verdict of not guilty only by reason of insanity. . . . [I]n light of that, it appears that the parties do not have a controversy over guilt." In other words, defense counsel not only did not object to the government's insanity evidence but also used the fact that the government had asked for an insanity verdict to argue that therefore Wattleton lacked the criminal intent necessary for a guilty verdict.

The district court then asked if defense counsel had "any Eleventh Circuit case law to support your argument?" When counsel responded, "No, sir", the district court stated, "I deny your motion on [the] case or controversy ground."[6]

## F.    Defendant's Evidence

After the court denied the Rule 29 motion, the defendant Wattleton testified and admitted making the threatening telephone calls. Wattleton stated that he made these calls to get arrested and that he did not actually intend to bomb anything or to harm anyone. He believed that once arrested he could prompt an investigation into the conspiracy of police harassment against him. After being fired from U.S. Motivation, Wattleton feared imminent physical harm from the

---

[6] Wattleton's Rule 29 motion actually focused more on other unrelated issues. Defense counsel argued mainly that the government (1) had improperly amended some of the indictment counts and (2) had failed to meet its burden of showing a nexus with interstate commerce. The court rejected these Rule 29 arguments, and Wattleton does not appeal its ruling on either issue.

police. His letter-writing campaign to various public officials had been unsuccessful in uncovering the conspiracy. Thus, he believed his only option, aside from suicide, was to make the threatening calls.[7]

The defense's expert, Dr. Rand, then testified regarding Wattleton's mental illness and its effect on his behavior. Specifically, Dr. Rand diagnosed Wattleton with delusional disorder, persecutory type, which she described "as a major mental illness that's very serious." Dr. Rand explained that persons with persecutory delusions fear that people are following or harassing them and trying to harm them. According to Dr. Rand, the combination of Wattleton's delusional disorder and the financial stress of being fired caused Wattleton to believe that the police would kill him on the street and that his threats were necessary to elicit an arrest and prompt an investigation into the conspiracy against him. Dr. Rand further opined that Wattleton's delusional disorder likely prevented him from comprehending that his threatening calls would cause the recipients of the calls to be fearful. Dr. Rand

---

[7] On cross-examination, Wattleton testified that he knew making bomb threats was illegal and that the police would arrest him, stating as follows:
> Q: Did you know that the police would ultimately come pick you up after you made the bomb threats?
> A: Yes.
> . . . .
> Q: And you knew that the police would come pick you up because the bomb threats were against the law?
> A: Yes.

11

also testified that persons with delusional disorder are often less likely to understand the nature and quality of their wrongful actions.

## G. Verdict Form

Before closing arguments, the district court discussed the verdict form. Pursuant to 18 U.S.C. § 4242(b), the government orally moved for a special verdict form that included the options of guilty, not guilty, and not guilty only by reason of insanity. Defense counsel for the first time then objected to the insanity verdict being put to the jury and on the verdict form.[8] Defense counsel also objected to the guilty option being on the verdict form and argued that "the government has not proven a requisite mental state on guilt" and that "at most it's proven not guilty by reason of insanity."[9] Thus, defense counsel once again focused on the "guilt"

---

[8]Later, defense counsel again objected to the not guilty by reason of insanity option being placed on the verdict form and requested the court to enter a continuing objection, which the court permitted.

[9]More specifically, defense counsel argued as follows:
And, Judge, particularly on the issue of guilt, the government has not proven the requisite mental state on guilt. I think even it [sic] intends to argue not guilty by reason of insanity rather than guilt, and I think that a directed verdict ought to be entered on the issue of guilt, if nothing else.
    In addition to that, we would preserve the previous argument we made in connection with the case or controversy . . . .
    But particularly on the issue of intent, I don't think the government has proven guilt. At most it's proven not guilty by reason of insanity.

12

option.  The district court granted the government's motion for a special verdict

form under 18 U.S.C. § 4242(b) and denied Wattleton's Rule 29 motion.[10]

## H.     Closing Arguments

After the charge conference, closing arguments ensued.  The government

outlined the evidence proving Wattleton made four telephonic bomb threats.  In

that regard, the government informed the jury that "[t]he judge will instruct you

that the government has to prove David Wattleton guilty before you can reach the

not guilty by reason of insanity verdict. . . . First, you have to find the defendant

guilty, and then you can reach the insanity question."  The government then

detailed both medical experts' testimony relevant to Wattleton's insanity.  After

---

[10]Later on, when the district court reviewed the pattern jury charge on insanity, defense counsel objected to placing the burden on the defendant to prove insanity.  Instead, defense counsel suggested that in light of the court's granting the government's request for the insanity option on the verdict form, the government should have to prove it.  Defense counsel stated:

> I think the government certainly would not disagree with the request
> that the fact that the defendant has to be the one that proves it.  We
> object to the government being the one to do it.   But if you're going
> to do it, I think it's appropriate to change the instruction to be
> consistent with the court's ruling.

The court's jury charge ultimately did not place the burden to prove insanity on the defendant.  Thus, defense counsel on appeal focuses on the insanity option being on the verdict form and the giving of any jury charge as to insanity (as opposed to the particular language of the jury charge).  The government has not cross appealed as to the language of the charge and any error as to the burden of proof favored the defendant.

13

reiterating that the jury first had to find Wattleton guilty before it could consider the insanity verdict, the government concluded that "[t]he government asks that you do justice in this case and ultimately return a verdict of not guilty, but only by reason of insanity."

In its closing argument, defense counsel agreed with the government that the jury may reach the insanity issue only if the government first proves guilt beyond a reasonable doubt. However, defense counsel argued that the jury should render a simple not guilty verdict because the government had not proven that Wattleton made the threats "willfully," which is the mens rea requirement for violations of 18 U.S.C. § 844(e).[11] In rebuttal, the government responded to the argument that it had not proven Wattleton had the requisite criminal intent by emphasizing the

---

[11]In making this argument, defense counsel focused on the definition of "willfully" that was to be provided in the jury instructions: an act is done "willfully" if "committed voluntarily and purposely with the specific intent to do something the law forbids, that is with bad purpose either to disobey or disregard the law." Defense counsel argued that Wattleton's delusional disorder impaired his ability to act with bad purpose. In that regard, defense counsel pointed to (1) Dr. Rand's testimony that Wattleton was so consumed by his own fears that he believed he had no choice but to make the threats, (2) Wattleton's testimony that he wanted only to initiate an investigation into the conspiracy, not actually harm anyone or bomb anything, and (3) the absence of evidence that Wattleton had acted violently in the past.

distinction between intent and motive.[12]   The jury ultimately rendered a verdict of not guilty only by reason of insanity on all four counts of the indictment.

## I.     Post-verdict Hearing under § 4243

Shortly after the insanity verdict, the district court committed Wattleton to the custody of the Attorney General of the United States, who agreed with the court's recommendation to designate the Federal Correctional Institution in Butner, North Carolina ("Butner") as the place of defendant's commitment and examination.   At Butner, Dr. Weaver, a forensic psychologist, examined Wattleton and then filed her report with the court for use in the post-verdict hearing required under 18 U.S.C. § 4243.  At the § 4243 hearing, which is commonly referred to as the "dangerousness hearing," the court addresses whether the insanity acquittee is eligible for release.  18 U.S.C. § 4243(a)-(e).

---

[12]Specifically, the government asserted that it had proven intent by showing that when Wattleton made the threatening telephone calls he voluntarily and purposely intended to do something the law forbids so that he would be arrested. In other words, the government argued that Wattleton intended to scare the recipients of his calls so that they would notify the police and he would be arrested. Even if Wattleton made the threats to elicit an arrest and initiate an investigation into the police conspiracy rather than to scare people, the government argued this purpose relates to motive and Wattleton's ability to understand the nature and quality of his actions.  Because Wattleton "didn't understand or appreciate that what he was doing was scaring the people as well as initiating a police investigation," the government concluded that "justice in this case requires that you return a verdict of not guilty, but only by reason of insanity."

At Wattleton's dangerousness hearing, the government called Dr. Weaver, and the defense called Dr. Artigues.[13]   Both experts recognized that several "risk factors" suggested that Wattleton was not dangerous.  For example, Dr. Weaver testified that Wattleton's age, socioeconomic and educational background, minimal criminal history, and lack of interest in or skill with the use of weapons were factors mitigating against the dangerousness determination.  Both experts stated that Wattleton had not displayed any violent behavior at Butner.

However, both experts agreed that the mitigating factors were outweighed by those indicating that Wattleton's release posed a substantial risk of bodily injury to another or serious damage to another's property due to Wattleton's delusional disorder.  Specifically, Dr. Weaver testified that Wattleton had delusional disorder of the persecutory type, which is a type of delusional disorder frequently linked to violent behavior.  As Wattleton had gotten older, his delusional disorder had worsened, but Wattleton still denied that he had a mental illness and refused recommended treatment.  Dr. Weaver further explained that Wattleton had a history of alcohol and marijuana abuse and that generally substance abuse

[13]Dr. Artigues had conducted Wattleton's pre-trial psychological examination at Butner and had been called by the government at trial.  However, at the time of the § 4243 hearing, Dr. Artigues was in private practice and no longer employed at Butner.

magnifies the potential for violence by reducing an individual's inhibitions. Dr. Weaver also opined that Wattleton's apparent lack of means of support increased the risk of danger to the community because Wattleton would be under great pressure to find some means to expose the perceived conspiracy. Similarly, Dr. Artigues summarized the most important factors weighing against Wattleton's release to be "the persistence of [Wattleton's] persecutory delusions and his investment in them which have dictated his behavior for a long time and my awareness that he does not have insight into these."

After considering evidence, the district court acknowledged that the "risk factors" pointed in both directions, but concluded that the mitigating factors were outweighed by factors indicating that Wattleton's release would pose a danger to the community. The specific "risk factors" on which the court relied included (1) the degree and extent of Wattleton's delusional disorder, (2) his lack of insight into his disorder and his unwillingness to seek treatment, (3) his lack of any apparent means of support, (4) his substance abuse history, (5) the worsening of his delusional disorder, and (6) his failure to comply in the past with treatment recommendations.[14]

_____

[14]The district court explained the relevance of certain factors. Specifically, as to the lack of means of support, the court stated that "[t]he Court takes this factor into consideration because it dictates the most likely circumstances,

17

The district court concluded that Wattleton failed to meet his burden of proving by a preponderance of the evidence that his release would not create a substantial risk of bodily injury to another person or serious damage to another's property due to a present mental disease or defect. The court also rejected defense counsel's arguments that § 4243(d)'s placing the burden of proof on Wattleton violates the Due Process Clause of the Fifth Amendment.[15] Thus, the court committed Wattleton to the custody of the Attorney General, pursuant to 18 U.S.C. § 4243(e).

Wattleton timely appealed the jury's insanity verdict and the court's rulings in the § 4243 hearing.

## II. DISCUSSION

---

circumstances certainly of stress, under which Mr. Wattleton would be operating with his paranoid delusional disorder." With respect to substance abuse, the court explained that "[r]elease would also result in a lack of structure in [Wattleton's] life and the opportunity to abuse alcohol and other substances, circumstances the Court finds are likely to lead Mr. Wattleton to engage in unlawful acts that would pose a serious risk of danger to the community."

[15]Relying on Jones v. United States, 463 U.S. 354 (1983), the district court ruled orally that placing the burden of proof on Wattleton did not violate due process because (1) the jury had found Wattleton guilty beyond a reasonable doubt of communicating bomb threats and (2) the jury had found by clear and convincing evidence that Wattleton was insane at the time of the offense conduct. Subsequently, the court entered a written order explaining why § 4243(d) is constitutional. See United States v. Wattleton, 110 F. Supp.2d 1380 (N.D. Ga. 2000).

## A.     Insanity Defense

On appeal, Wattleton asserts that the district court erred in allowing the government to impose the insanity defense on him at trial.   It is well established that insanity is an affirmative defense.  18 U.S.C. § 17; United States v. Westcott, 83 F.3d 1354, 1359 (11th Cir. 1996).  In fact, a defendant who intends to rely on the insanity defense or present expert testimony relating to a mental disease or defect must file a Rule 12.2 pre-trial notice to that effect.[16]  The objective of such a notice is to "give the government time to prepare to meet the issue, which will

---

[16]Federal Rule of Criminal Procedure 12.2 provides:
    (a) **Defense of Insanity**.  If a defendant intends to rely upon the defense of insanity at the time of the alleged offense, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk.  If there is a failure to comply with the requirements of this subdivision, insanity may not be raised as a defense.  The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate.
    (b) **Expert Testimony of Defendant's Mental Condition.**  If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of guilt, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk.  The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate.

19

usually require reliance upon expert testimony." Fed. R. Crim. P. 12.2 Advisory

Committee Notes. In addition, we agree with Wattleton that whether to raise the

insanity defense is a decision for the defendant and his counsel.[17]

The problem for Wattleton here, however, is that the record does not support

his contention that the government imposed the insanity defense on him. Instead,

the record shows that Wattleton invoked the insanity defense and presented

evidence of that defense. Specifically, Wattleton filed a Rule 12.2 notice of his

insanity defense and his intent to rely on expert testimony to support that defense,

and he never withdrew that notice. Moreover, throughout the presentation of the

evidence at trial, defense counsel did not object to the government's medical

evidence of Wattleton's insanity. Indeed, on cross examination, defense counsel

brought out further evidence of Wattleton's insanity, asking Dr. Artigues to

confirm his prior report's conclusion that Wattleton was not criminally responsible

for the charged offenses. In addition, defense counsel also presented evidence of

Wattleton's insanity. Specifically, defense counsel had his own expert, Dr. Rand,

---

[17]See Edwards v. United States, 795 F.2d 958, 963 (11th Cir. 1986) (rejecting argument that the court must raise insanity defense for the defendant and reasoning that "defense strategy and tactics are a matter for decision by defendant and his counsel"); United States v. Marble, 940 F.2d 1543, 1548 (D.C. Cir. 1991) ("[A] district court must honor the choice of a competent defendant not to raise the insanity defense.").

testify about the seriousness of Wattleton's delusional disorder and that persons with this type of disorder are often less likely to understand the nature and quality of their wrongful actions.

Defense counsel pursued the trial strategy of focusing more on the not guilty option, but by no means withdrew Wattleton's insanity defense during the evidence at trial. In fact, we interpret defense counsel's failure to object to the government's insanity evidence as strategically sound. Since the government was conceding insanity, the defense could focus on the threshold issue of guilt. Thus, the worst case scenario from Wattleton's perspective was that he would be found not guilty only by reason of insanity.[18]

Moreover, if a defendant files a Rule 12.2 notice of his insanity defense, presents evidence of insanity both in cross-examining the government's expert and presenting his own expert, that defendant may not then preclude the insanity option

---

[18]In addition, Wattleton's contention that no issue of guilt existed in this case because the government was arguing for an insanity verdict lacks merit. A verdict of not guilty only by reason of insanity establishes that "(1) the defendant committed an act that constitutes a criminal offense, and (2) he committed the act because of mental illness." Jones v. United States, 463 U.S. 354, 363 (1983). Therefore, a jury can only render a not guilty by reason of insanity verdict by first determining whether the defendant is guilty. Indeed, the jury was instructed that it first must determine whether the government had proven beyond a reasonable doubt that the defendant had committed the charged offense before considering whether Wattleton committed the acts because of a mental disease or defect.

on the verdict form and an insanity jury instruction. In <u>United States v. Westcott</u>, 83 F.3d 1354 (11th Cir. 1996), this Court precluded a defendant from presenting insanity evidence but avoiding a jury charge as to insanity. In <u>Westcott</u>, a defendant, charged with falsely representing that he was a U.S. Secret Service agent, sought to present expert testimony that he could not form the requisite intent because his bipolar disorder caused him to believe he was actually a Secret Service agent. <u>Id.</u> at 1356-57. Although the defendant filed a notice under both Rule 12.2(a) and (b), he subsequently withdrew his notice of intent to rely on the insanity defense, "intending to use expert psychiatric testimony only to demonstrate that he lacked the necessary *mens rea* for the specific intent crime with which he was charged." <u>Id.</u> at 1356.

In <u>Westcott</u>, the government moved to limit or prohibit the defense expert's testimony. <u>Id.</u> At a hearing on the motion, the defense expert testified that defendant's mental condition not only negated the *mens rea* for the charged offense but also caused the defendant to meet the test for insanity. <u>Id.</u> at 1357, 1359. In particular, the expert testified that, due to a mental defect, the defendant was unable to appreciate the wrongfulness of his conduct. <u>Id.</u> at 1358-59. The district court ruled that because the proffered testimony acted to <u>both</u> negate *mens rea* and to satisfy the definition of insanity, the "testimony was only admissible if

22

accompanied by a jury instruction regarding the affirmative defense of insanity."
Id. at 1358.

This Court affirmed in Westcott, reasoning that "admitting Dr. Miller's testimony solely as *mens rea* evidence would allow [the] defendant to present insanity defense evidence while avoiding the burden of proof mandated by the Insanity Defense Reform Act."[19]  Id. at 1359.  Moreover, we rejected the defendant's argument that the insanity defense was impermissibly imposed on him. Id.  The trial court had not sought to inject the insanity defense after it had been waived by the defendant, but rather the "defendant sought to present evidence of insanity without assuming the burden of proof required by the Insanity Defense Reform Act."  See id. (distinguishing United States v. Marble, 940 F.2d 1543 (D.C. Cir. 1991)).  This Court agreed with the district court that the proffered evidence both negated *mens rea* and supported the insanity defense.  Id.  Thus, we concluded that even if the defendant did not expressly argue for the insanity

---

[19]Westcott  emphasized the distinctions between the verdicts of not guilty and not guilty only by reason of insanity following the enactment of Insanity Defense Reform Act of 1984 ("IDRA").   Prior to IDRA's enactment, "federal courts generally did not recognize a verdict of 'not guilty by reason of insanity.'" Shannon v. United States, 512 U.S. 573, 575 (1994).  Instead, "[d]efendants who mounted a successful insanity defense – that is, those who raised a reasonable doubt as to their sanity at the time of the offense – were simply found 'not guilty.'" Id.

23

verdict, the defendant could not preclude the insanity instruction when he had presented an evidentiary foundation for that defense.  See id.

Likewise here, defense counsel specifically brought out on cross examination of Dr. Artigues and redirect of Dr. Rand that due to a mental defect Wattleton was unable to appreciate the nature and quality of his wrongful behavior. Defense counsel also did not object to the government's presentation of insanity evidence.  Thus, the trial evidence supported the insanity defense in addition to the theory that Wattleton lacked the requisite intent for § 844(e) violations.

Furthermore, 18 U.S.C. § 4242(b) authorizes the government to request a not guilty by reason of insanity verdict, providing as follows:

> (b) **Special verdict**.  If the issue of insanity is raised by notice as provided in Rule 12.2 of the Federal Rules of Criminal Procedure on motion of the defendant or of the attorney for the Government, or on the court's own motion, the jury shall be instructed to find, or, in the event of a non-jury trial, the court shall find the defendant–
> (1) guilt;
> (2) not guilty; or
> (3) not guilty only by reason of insanity.

18 U.S.C. § 4242(b) (emphasis added).   Thus, the government may request a special verdict form and insanity instruction, although a court will only grant this request when an evidentiary foundation for the defense exists.  See United States v. Owens, 854 F.2d 432, 435 n.7 (11th Cir. 1988) ("We do not understand [Section 4242(b)] to be a command – regardless of the lack of an evidentiary foundation for

24

the defense – to instruct the jury on the insanity defense and to use a special verdict form just because a Rule 12.2 Notice has been filed."). As the requisite evidentiary foundation was established, we further conclude that the government not only did not impose the insanity defense on Wattleton, but it also was justified in requesting an insanity instruction and special verdict form.[20]

## B. Section 4243 Hearing

On appeal, Wattleton also challenges his civil commitment to Butner. We review the relevant statutory framework and then Wattleton's claims.

---

[20]The district court also did not err in refusing to give Wattleton's requested jury instruction on the affirmative defense of coercion or duress. There was no evidentiary foundation for that defense. See, e.g., United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995); United States v. Alston, 895 F.2d 1362, 1367 (11th Cir. 1990). To establish a coercion or duress defense, "a defendant must show that he acted under an immediate threat of death or serious bodily injury, that he had a well-grounded fear that the threat would be carried out, and that he had no reasonable opportunity to escape or inform [the] police." United States v. Alzate, 47 F.3d 1103, 1104 (11th Cir. 1995) (internal quotation marks omitted); see also United States v. Lee, 694 F.2d 649, 654 (11th Cir. 1983); Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 69 (West 1997). The "requirement of immediacy of the threat is a rigorous one" in which "fear of *future* bodily harm to one's self or to others will not suffice." See United States v. Sixty Acres in Etowah County, 930 F.2d 857, 861 (11th Cir. 1991) (internal quotation marks omitted). Although we recognize that both experts testified that Wattleton believed the police were conspiring to harass him, they also agreed that his fear was engendered by mental illness. Indeed, there was no evidence at all that the police were conspiring to harass him, and thus Wattleton's fear was not well grounded.

Under 18 U.S.C. § 4243, a defendant found not guilty by reason of insanity of federal crimes is committed to a suitable facility pending a hearing to determine whether he is eligible for release.[21] Specifically, not later than forty days following the insanity verdict, an adversarial hearing is conducted to determine whether the insanity acquittee's release "would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect." 18 U.S.C. § 4243(c)-(d). Prior to this hearing, a court-ordered psychiatric or psychological examination of the insanity acquittee is performed, and a report from that examination is filed with the court. 18 U.S.C. §§ 4243(b), 4247(b)-(c).

The § 4243 hearing is a civil, not criminal, hearing. See Shannon v. United States, 512 U.S. 573, 577 (1994); United States v. Cameron, 907 F.2d 1051, 1061 (11th Cir. 1990).[22] Section 4243(d) provides that a defendant found not guilty by reason of insanity of an offense involving bodily injury, serious damage to

---

[21]See also Shannon v. United States, 512 U.S. 573, 577 (1994) (noting that § 4243 creates a "comprehensive civil commitment procedure," under which an insanity acquittee is held in custody pending a court hearing).

[22]Although a civil hearing, the insanity acquittee whose mental condition is at issue at the dangerousness hearing has a right to counsel. 18 U.S.C. § 4247(d). The insanity acquittee also must be given the "opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses." Id.

another's property, or substantial risk of such injury or damage has the "burden of proving by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect." 18 U.S.C. § 4243(d).[23] Section 4243(d) further provides that with respect to any other offense, the defendant's burden is a preponderance of the evidence.[24] Id. If a defendant fails to meet his burden of proof, the court must commit him to the custody of the Attorney General of the United States, see 18 U.S.C. § 4243(e), who, in turn, arranges for his care and treatment. 18 U.S.C. §§ 4243(e), 4247(i)(A).

1. Due Process Challenge

---

[23] 18 U.S.C. § 4243(d) provides:
In a hearing pursuant to subsection (c) of this section, a person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a substantial risk of such injury or damage, has the burden of proving by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect. With respect to any other offense, the person has the burden of such proof by a preponderance of the evidence.

[24]The district court applied the preponderance of the evidence standard at Wattleton's dangerousness hearing, and the government does not cross appeal. Thus, we need not address whether the higher standard of clear and convincing evidence applied to Wattleton's offenses.

27

Wattleton's first claim is that Congress's placing the burden of proof on the insanity acquittee under § 4243(d) violates his due process rights under the Fifth Amendment.[25]  For several reasons, we disagree.

First, although this Court has never directly addressed the constitutionality of § 4243(d), this Court has found similar provisions that place the burden of proof on insanity acquittees at release proceedings under Georgia and Alabama law to be constitutional.  See Benham v. Ledbetter, 785 F.2d 1480, 1491-92 (11th Cir. 1986) (concluding, inter alia, that the procedure of placing the burden of proof on the insanity acquittee at the release proceeding under Georgia's statutory scheme did not violate due process);  Williams v. Wallis, 734 F.2d 1434, 1440 (11th Cir. 1984) (concluding that in the context of Alabama's statutory scheme for release of insanity acquittees, "due process does not forbid placing the burden of proof on the acquittee at the habeas proceeding to prove by a preponderance of the evidence that he is no longer mentally ill or dangerous").

Second, the two circuits that have examined the constitutionality of § 4243(d) have both found no due process violations.  See United States v. Phelps, 955 F.2d 1258, 1267-68 (9th Cir. 1992) ("[W]e hold that the statute [§ 4243(d)]

_____

[25]We review de novo whether § 4243(d) is unconstitutional.  See United States v. Westcott, 83 F.3d 1354, 1357 (11th Cir. 1996).

28

does not violate due process by placing the burden of proof on an insanity acquittee in a release hearing."); United States v. Wallace, 845 F.2d 1471,1474 (8th Cir. 1988) ("[P]lacing the burden of proof on a defendant found not guilty only by reason of insanity and committed in accordance with § 4243 comports with due process and passes constitutional muster.").

Third, in determining whether procedures in the civil context satisfy due process, this Court traditionally has balanced the three factors set forth in Mathews v. Eldridge, 424 U.S. 319 (1976).[26] These three Mathews factors are (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335. After balancing these factors, as outlined below, we conclude that § 4243(d) is constitutional.

---

[26]For example, in both Benham and Williams, we balanced the Mathews factors in determining whether the challenged release procedures under the relevant state laws violated due process. See Benham, 785 F.2d at 1485-88, 1491; Williams, 734 F.2d at 1438-40.

As to the first Mathews factor, "[i]t is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'" Jones v. United States, 463 U.S. 354, 361 (1983) (quoting Addington v. Texas, 441 U.S. 418, 425 (1979)). The private interest at issue is also the "stigma" of being placed in a mental institution for an indefinite duration. See Addington, 441 U.S. at 425-26.

Countervailing factors, however, ameliorate the negative effects on Wattleton's private interests. While committed in a "suitable facility," Wattleton will receive the benefits of hospitalization, care, and treatment, since a "suitable facility" is one "that . . . provide[s] care or treatment given the nature of the offense and the characteristics of the defendant." 18 U.S.C. § 4247(a)(2); see Wallace, 845 F.2d at 1474. Moreover, the duration of Wattleton's confinement is restrained by due process. "Due process requires that the nature of the commitment bear some reasonable relation to the purpose for which the individual is committed." Foucha v. Louisiana, 504 U.S. 71, 79 (1992). Since an insanity acquittee is confined to treat a mental illness and to safeguard society from danger, Wattleton may be confined only as long as he is both mentally ill and dangerous. Id. at 77.[27]

_____

[27]Consistent with due process restraints, an insanity acquittee may be discharged when the director of the facility where the acquittee is hospitalized certifies to the court that ordered the commitment that the acquittee is no longer

30

Because the jury's verdict already labeled Wattleton insane, any additional social stigma due to confinement is minimal. See Jones, 463 U.S. at 366 n.16, 370 (contrasting insanity acquittees from other candidates for confinement).

Turning to the second Mathews factor, Wattleton argues that placing the burden of proof on the insanity acquittee increases the risk of erroneous confinement decisions because, as revealed in the scientific literature, mental health experts are unable to accurately predict future dangerousness. The flaw in this argument is that the difficulty of predicting dangerousness exists regardless of which party has the burden of proof. In addition, this Court concluded in Benham v. Ledbetter, 785 F.2d 1480 (11th Cir. 1986) that "[t]he relative lack of confidence in scientific diagnoses of mental illness and prediction of dangerousness alters somewhat the traditional due process concern with accuracy, which customarily is meant to protect the individual interest." Id. at 1487. This Court indicated that "[i]n the context of the insanity defense, therefore, the second Mathews factor serves both the state's and the insanity acquittee's interest in an accurate decision." Id.

---

dangerous or suffering from a mental defect, and the court agrees. See 18 U.S.C. § 4243(f). In addition, § 4243(g) provides that nothing in § 4243 precludes an individual from petitioning for a writ of habeas corpus.

31

In fact, the risk of an erroneous decision is significantly reduced because a §

4243 hearing arises only after a jury finds a defendant not guilty by reason of

insanity and only after all the procedural protections have been afforded the

defendant in a criminal trial.  The insanity verdict establishes both (1) that "the

defendant committed an act that constitutes a criminal offense" and (2) that "he

committed the act because of mental illness."  Jones, 463 U.S. at 363.[28]   The

Supreme Court concluded in Jones that "[t]he fact that a person has been found,

beyond a reasonable doubt, to have committed a criminal act certainly indicates

dangerousness," and "[i]t comports with common sense to conclude that someone

whose mental illness was sufficient to lead him to commit a criminal act is likely to

remain ill and in need of treatment."  Id. at 364, 366.  Subsequently, in Foucha, the

Supreme Court reaffirmed that "it could be properly inferred that at the time of the

[insanity] verdict, the defendant was still mentally ill and dangerous and hence

---

[28] Jones predated the Insanity Defense Reform Act of 1984.  Although the
Supreme Court in Jones was construing the insanity defense under the District of
Columbia Code and did not directly address the burden of proof in § 4243
hearings, the Supreme Court's reasoning regarding the significance of the insanity
verdict is equally relevant to the issue here. See Wallace, 845 F.2d at 1473 (noting
that "the Court's discussion [in Jones] of due process and the commitment of
insanity acquittees provides support for procedural limitations on the release of
committed insanity acquittees").

could be committed." 504 U.S. at 76; see also Benham, 785 F.2d at 1490-91.[29]

Thus, the insanity verdict in and of itself supports the conclusion that the insanity acquittee continues to be mentally ill and dangerous.

In addition, practical considerations support allocating the burden of proof to the insanity acquittee at the dangerousness hearing. In making its decision, the court relies on mental health experts' recommendations and reports concerning the

---

[29]The Supreme Court in Jones specifically concluded that the insanity verdict creates the inference that at the time of the verdict, the insanity acquittee remains mentally ill and dangerous, thereby justifying automatic commitment pending a release proceeding. 463 U.S. at 366. In Benham, this Court broadly construed Jones in the context of a release hearing under Georgia law. Specifically, in Benham, a class of plaintiffs challenged, under the Due Process Clause, the procedures at Georgia release hearings of imposing the burden of proof on insanity acquittees and applying a rebuttable presumption of continuing insanity. 785 F.2d at 1489-92. Relying on Jones and applying the Mathews factors, this circuit rejected these challenges. As to the continuing presumption of insanity, this Court noted that "despite our sense of caution in applying the Jones holding to an insanity acquittee in release hearings held years after the criminal act, we see no empirical basis offered by the class that this presumption is so irrelevant to some members of the class as to violate the due process clause." Id. at 1490. This Court further stated that "[i]n light of the lessened liberty interest of an insanity acquittee as compared with a candidate for civil commitment and the substantial state interest in lay control over the consequences of the insanity defense, we cannot say that Georgia has erred in imposing a presumption of continuing insanity on those who successfully invoke the insanity defense." Id. at 1491. We also concluded that for "substantially similar reasons" placing the burden of proof on an insanity acquittee at a release hearing did not violate due process. Id. at 1491-92.

33

insanity acquittee's mental condition.[30]  Mental health experts formulate their

conclusions as to an insanity acquittee's dangerousness and mental illness in part

by examining the insanity acquittee.  If the government were to bear the burden of

proof, the accuracy of risk assessments could be impeded by an acquittee who was

reluctant or unwilling to cooperate in the mental examination.[31]  By comparison, an

insanity acquittee with the burden of proof has an incentive to cooperate in the

mental examination.

The last Mathews factor is the government's interests, including its fiscal

and administrative burdens.  The government undoubtedly has a strong interest in

safeguarding society from individuals who pose a danger to persons or property

because of their mental illness.[32]   In addition, the government has an interest in

avoiding relitigation of the trial at the dangerousness hearing.  See Wallace, 845

---

[30]See 18 U.S.C. § 4243(b) (providing that prior to the § 4243 hearing, a court-ordered psychiatric or psychological examination of the insanity acquittee shall be completed and a report shall be filed with the court).

[31]See State v. Platt, 19 P.3d 412, 417 (Wash. 2001) (en banc) ("If the State had the burden of proof, an insanity acquittee could refuse to participate in testing, prevent the State from obtaining critical information about his mental health, and then seek release because the State cannot prove that he is mentally ill.") (internal quotation marks omitted), cert. denied, 122  S. Ct. 161 (2001).

[32]See, e.g., Williams, 734 F.2d at 1440 (recognizing that "the state's interest in preventing the premature release of individuals who have already proven their dangerousness to society by committing a criminal act" outweighs the acquittee's interest in avoiding continued confinement).

F.2d at 1474. Furthermore, as described earlier, the government potentially could confront an insanity acquittee who is unwilling to cooperate in a mental examination that is necessary to obtain crucial medical information.

In sum, after weighing the Mathews factors, we conclude that § 4243(d) does not violate Wattleton's due process rights.[33]

2. Dangerousness Assessment

Wattleton also challenges the merits of the district court's release decision. Wattleton contends that the court erred in considering two factors that have no nexus to Wattleton's mental defect. Specifically, Wattleton contends that the court improperly considered (1) "[t]he fact that Mr. Wattleton had no apparent means of support were he to be released," and (2) the fact that "release would also result in a lack of structure in [Wattleton's life] and the opportunity to abuse alcohol and other substances." Wattleton argues that considering these factors in making a dangerousness assessment is inconsistent with § 4243.[34]

_____

[33]Despite Wattleton's argument to the contrary, our analysis is unaltered by the fact that the government presented insanity evidence and sought a special verdict form under § 4242(b). As outlined earlier, the record does not support Wattleton's contention that the government imposed this defense on him.

[34]This Court has never directly addressed what is the appropriate standard to review a district court's finding of dangerousness under § 4243. However, as guidance, we have previously looked to the standard applied to determinations of a defendant's competency to stand trial. See United States v. Clark, 893 F.2d 1277,

35

We agree with Wattleton that the plain language of § 4243(d) provides that the risk of danger posed by release must be the result of an insanity acquittee's present mental disease or defect. See 18 U.S.C. 4243(d) (stating that defendant must prove his "release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect") (emphasis added). Although § 4243 does not provide a checklist of factors a court shall consider in assessing the dangerousness of an insanity acquittee, the factors must relate to the risk of danger caused by a present mental disease or defect.

However, we reject Wattleton's argument that these two factors are not related to the risk of danger posed by Wattleton's delusional disorder. First, as to lack of means of support, both the defense's and the government's experts testified that Wattleton's fears of persecution, which had resulted in his criminal activity, were exacerbated by financial stress. In other words, financial stress affected how

---

1281-82 ("While we are unaware of any authority establishing a standard of review for section 4243 cases in this circuit, we believe cases dealing with determination of a defendant's competency to stand trial are most apposite."). The standard for competency to stand trial is clearly erroneous. United States v. Hogan, 986 F.2d 1364, 1372 (11th Cir. 1993). Other circuits have reviewed a district court's dangerousness findings under the clearly erroneous standard. See, e.g., United States v. Jackson, 19 F.3d 1003, 1006 (5th Cir. 1994); United States v. Steil, 916 F.2d 485, 487-88 & n.4 (8th Cir. 1990). Therefore, we apply a clearly erroneous standard in reviewing the district court's dangerousness findings.

Wattleton coped with his delusional disorder, which, in turn, affected the risk posed by the disorder. For example, Dr. Rand, the defense's expert, testified at trial that "the fact that [Wattleton] had been evicted within two weeks of the time that [the firing] happened was a big stressor, and the financial stress alone was a significant stressor for him. So I think those two stressors exacerbated his psychotic thinking." Similarly, Dr. Weaver, the government's expert, testified at the § 4243 hearing that it is more difficult for persons lacking means of support to function in the community and that Wattleton would be under greater pressure to find some means to expose his conspiracy upon release if he lacked a means of support. Thus, since Wattleton would confront financial circumstances upon release that were similar to those existing before commission of the offenses, the district court did not err in considering financial stress as a relevant risk factor.

Second, the district court did not err in considering the opportunity Wattleton would have to abuse alcohol and drugs if released. It was undisputed that Wattleton had a history of alcohol and marijuana abuse and that he had not yet received any successful treatment for these problems. Dr. Weaver testified that substance abuse generally increases the potential for violence and that "when you take somebody who has the type of mental illness that Mr. Wattleton has, the combination of the two [the mental illness and the substance abuse] increases the

risk even more." Dr. Weaver further testified that alcohol abuse generally reduces inhibitions and the reduction of inhibitions is magnified when combined with the presence of a mental illness. Therefore, since substance abuse may interact with Wattleton's delusional disorder to magnify the unfavorable effects of substance abuse, including the potential for violence, the district court may consider substance abuse as a factor in predicting the risk posed by Wattleton's delusional disorder.[35]

In sum, we conclude that the factors of lack of means of support and substance abuse are related to the risk posed by Wattleton's delusional disorder. Thus, the district court did not err in considering them in its release decision.

### III. CONCLUSION

---

[35]Wattleton's reliance on Foucha v. Louisiana, 504 U.S. 71 (1992) is misplaced. In Foucha, the Supreme Court found unconstitutional a Louisiana statute under which an insanity acquittee remained confined until he proved he was not dangerous, even if he was no longer mentally ill. 504 U.S. at 83. In so doing, the Supreme Court reaffirmed its prior holding that "the acquittee may be held as long as he is both mentally ill and dangerous, but no longer." Id. at 77. Since it was undisputed that the defendant in Foucha did not have a mental disease or defect at the time of his dangerousness hearing, the Supreme Court concluded that the State was no longer entitled to confine the defendant. Id. at 78. Although the holding of Foucha provides that a defendant's dangerous propensities alone may not serve as a continued basis for confinement following an insanity verdict, it does not support Wattleton's argument that the factors at issue here were general dangerousness factors unrelated to his mental defect.

38

For all of the foregoing reasons, we affirm the jury's insanity verdict and the district court's rulings in the § 4243 hearing.

**AFFIRMED.**