# Illinois Official Reports

## Appellate Court

---

### *People v. Gunderson*, 2017 IL App (1st) 153533

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SEAN GUNDERSON, Defendant-Appellant. |
| | |
| District & No. | First District, Second Division<br>Docket No. 1-15-3533 |
| | |
| Filed<br>Rehearing denied | June 20, 2017<br>July 14, 2017 |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 02-CR-28384; the Hon. Earl Hoffenberg, Judge, presiding. |
| | |
| Judgment | Affirmed. |
| | |
| Counsel on Appeal | Kretchmar & Cecala, P.C., of Wilmette (S. Randolph Kretchmar, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Jon Walters, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion.<br>Presiding Justice Hyman and Justice Pierce concurred in the judgment and opinion. |

**OPINION**

¶ 1    In 2005, a court found Sean Gunderson, charged with attempted murder, not guilty by reason of insanity. Gunderson petitioned for discharge from the custody of the Department of Human Services (DHS) in 2015. The trial court denied the petition. On appeal, Gunderson argues that section 5-2-4(g) of the Unified Code of Corrections (Code) (730 ILCS 5/5-2-4(g) (West 2014)) violates his right to due process because it requires him to prove by clear and convincing evidence that he no longer suffers from a mental illness. We find the statute constitutional. Accordingly, we affirm the trial court's judgment.

¶ 2                                          BACKGROUND

¶ 3    In 2002, Gunderson cut the throats of his mother, his father, and his grandmother. Prosecutors charged him with attempted murder and aggravated battery. Following a bench trial, the court found Gunderson not guilty by reason of insanity. He has remained in the custody of DHS since the trial.

¶ 4    In April 2015, Gunderson filed a motion for discharge from DHS, or for on-grounds pass privileges. At the hearing on the motion, Gunderson's mother testified that she spoke with and visited Gunderson frequently throughout his confinement, and she believed that he had recovered from his illness. She believed that he did not present a threat of harm to anyone. If DHS released Gunderson, Gunderson could live with his parents.

¶ 5    Dr. Vikramjit Gill, who began treating Gunderson in July 2014, recommended the on-grounds pass privileges. According to Dr. Gill, Gunderson no longer showed any symptoms of mental illness. Dr. Gill had not prescribed any medication for Gunderson. Dr. Gill described Gunderson as a high-functioning patient, with schizophrenia in remission, who had progressed well without medication since 2011.

¶ 6    Faye Edlund, a social worker who had served on Gunderson's treatment team since February 2013, testified that no one on the treatment team recommended discharge for Gunderson. Edlund never saw Gunderson act aggressively, and she saw no overt signs or symptoms of schizophrenia. She signed onto the recommendation for on-grounds passes, so that the treatment team could assess how well Gunderson could handle increased freedom.

¶ 7    Martha Welch, a psychologist who reviewed the treatment team's recommendation, agreed that Gunderson should have on-grounds passes. She interviewed Gunderson and members of the treatment team and concluded that Gunderson presented little risk of violent behavior.

¶ 8    Dr. Mathew Markos, who examined Gunderson four times in 2003 and 2004, interviewed Gunderson briefly in April 2015 to determine whether to support the treatment team's recommendation. In Dr. Markos's opinion, schizophrenia is always a lifelong illness that patients can control only with antipsychotic medication. Dr. Markos found that Gunderson showed several signs of continuing schizophrenia. First, Gunderson spoke rapidly during the interview. Dr. Markos asked Gunderson whether Gunderson had a mental illness. Dr. Markos testified that Gunderson answered, "I have disconnections with reality I tend to attribute to spiritual reasons; when I was 17, I wasn't living healthy. There was an unresolved spiritual crisis." Dr. Markos characterized the response as "delusional." Dr. Markos added, "He's not in touch with reality. He lacks insight. He will not take his medication, and that's just not the way

to proceed with schizophrenia illness." Dr. Markos could not understand why Dr. Gill decided not to prescribe antipsychotic medication for Gunderson.

¶ 9 Dr. Markos did not know of any studies that support his assertions, but he knew of no instance in which a schizophrenic patient recovered without remaining on antipsychotic medication for life. Because Dr. Gill did not prescribe antipsychotic medication for Gunderson, Dr. Markos opposed the request for on-grounds pass privileges.

¶ 10 Dr. Toby Watson, who has a degree in clinical psychology, testified about long-term studies of schizophrenia. Dr. Watson said that every controlled study of patients treated for more than one year showed that schizophrenic patients given minimal medication, or no medication at all, had much better recovery rates than patients treated regularly with antipsychotics. Dr. Watson explained that antipsychotic medication blocks dopamine, and thereby produces the immediate effect of reducing hallucinations and delusions. But after extended dopamine deprivation, the brain compensates by finding ways to produce more dopamine. To continue controlling the brain, doctors usually need to increase the dosage of antipsychotics. The antipsychotics have side effects that damage the brain. Dr. Watson testified that "outcome studies have been showing that people who stay on medication can chronically become disabled and mentally ill potentially for life."

¶ 11 Dr. Watson said that he found no studies showing that treatment for more than one year with antipsychotics improved results for schizophrenic patients. In response to a question from Gunderson's attorney, Dr. Watson said, "What do you call it if somebody believes something and all the overwhelming evidence says contrary to that? *** I mean, it's delusion." Dr. Watson then related the course of his own beliefs on the issue. All of his professors taught that one must use antipsychotic drugs to treat schizophrenia, and he fully accepted the teaching. His opinion gradually changed in light of the studies he read. The prosecutor, claiming that Dr. Watson's testimony implied that Dr. Markos suffered from delusions about the nature of schizophrenia, asked Dr. Watson whether doctors should prescribe medication for Dr. Markos to help control his delusions. Dr. Watson answered, "He, obviously, has not seen *** the same research that I've seen and reviewed."

¶ 12 Dr. Watson tested and interviewed Gunderson. Dr. Watson found that Gunderson no longer met the criteria for a diagnosis of schizophrenia. Dr. Watson concurred with the recommendation for on-grounds passes, adding that the treatment team would need to assess Gunderson's response to the increased freedom. In Dr. Watson's opinion, Gunderson presented only a low level of risk for adverse behavior with more freedom.

¶ 13 The trial judge found Dr. Watson not credible, especially because the judge believed Dr. Watson called Dr. Markos delusional. The trial judge also gave little weight to the testimony of Dr. Gill, Welch, and Edlund. Instead, the judge relied on his interpretation of Edlund's body language and the testimony of Dr. Markos. The judge believed that Edlund felt very uncomfortable with the recommendation for on-grounds passes. Although the judge relied on Dr. Markos's opinion, the judge expressly said that Dr. Markos did not convince him that patients must have antipsychotic drugs for life to control schizophrenia. The judge denied the motion for on-grounds passes and the motion for discharge.

¶ 14 Gunderson filed a motion for reconsideration, appending to the motion studies and articles supporting the conclusion that schizophrenics have a better chance of recovery when doctors treat them with minimal drug therapy, eliminating the use of antipsychotics as soon as possible. Gunderson also argued that the statute requiring him to prove by clear and convincing

evidence that he had no mental illness violated his right to due process. The trial judge denied the motion for reconsideration. Gunderson now appeals.

¶ 15                                                    ANALYSIS

¶ 16        Gunderson has abandoned his pursuit of on-grounds passes. He challenges only the constitutionality of section 5-2-4 of the Code. 730 ILCS 5/5-2-4(g) (West 2014). Gunderson contends that, if he presents a *prima facie* case to show that he no longer suffers from a mental illness, the due process clause requires the burden to shift to the State to prove that he meets the criteria for involuntary commitment. If the State cannot meet that burden, it must release him from confinement.

¶ 17        Our supreme court has instructed us not to address arguments challenging the constitutionality of statutes unless we find that we cannot resolve the case on nonconstitutional grounds. *People v. Hampton*, 225 Ill. 2d 238, 243-44 (2007). The State argues that regardless of the burden, the State would not have released Gunderson because no one on his treatment team recommended discharge. But Gunderson argues that the constitution requires release as long as he makes a *prima facie* case that he no longer suffers from a mental illness and the State fails to prove that he meets the statutory criteria for involuntary commitment, even if no one on his treatment team recommends discharge. None of the witnesses other than Dr. Markos saw any symptoms of schizophrenia for several years. Dr. Watson expressly found that Gunderson no longer met the criteria for a diagnosis of schizophrenia. While Dr. Gill diagnosed Gunderson's condition as schizophrenia in remission, that diagnosis remains compatible with a finding that Gunderson no longer suffers from a mental illness. *Levine v. Torvik*, 986 F.2d 1506, 1513-14 (6th Cir. 1993), *overruled in part on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

¶ 18        The doctors in *Foucha v. Louisiana*, 504 U.S. 71, 74 (1992), described Foucha as mentally ill with his illness in remission. The Supreme Court of the United States accepted the State of Louisiana's concession that the testimony showed that Foucha no longer suffered from any mental illness. *Foucha v. Louisiana*, 504 U.S. at 85. We find that Gunderson presented a *prima facie* showing that he no longer suffers from a mental illness. Thus, we must address Gunderson's constitutional argument.

¶ 19        Section 5-2-4 provides that every person committed to the custody of DHS following a finding of not guilty by reason of insanity may petition for discharge. 730 ILCS 5/5-2-4(e) (West 2014). Subsection (g) provides that when a defendant files a petition for discharge, "[t]he findings of the Court shall be established by clear and convincing evidence. The burden of proof and the burden of going forth with the evidence rest with the defendant *** when a hearing is held to review a petition filed by or on behalf of the defendant." 730 ILCS 5/5-2-4(g) (West 2014). Thus, section 5-2-4(g) requires a defendant who seeks discharge to prove, by clear and convincing evidence, either that he has no mental illness or that he is not dangerous. See *People v. Wolst*, 347 Ill. App. 3d 782, 790 (2004).

¶ 20        The defendant in *Wolst* also argued that section 5-2-4(g) violated his rights to substantive and procedural due process. The *Wolst* court first dismissed the substantive due process argument, finding that "the burden of proof at a commitment hearing is an issue of procedure not substance." *Wolst*, 347 Ill. App. 3d at 805.

¶ 21        The decision in *United States v. Wattleton*, 296 F.3d 1184 (11th Cir. 2002), guided the *Wolst* court's resolution of the procedural due process argument. *Wolst*, 347 Ill. App. 3d at

- 4 -

807-08. Wattleton challenged the constitutionality of a federal statute similar to section 5-2-4(g). A person committed to a hospital following a federal court's finding of not guilty by reason of insanity may petition for release. 18 U.S.C. § 4243 (2000). "Section 4243(d) provides that a defendant found not guilty by reason of insanity of an offense involving bodily injury, serious damage to another's property, or substantial risk of such injury or damage has the 'burden of proving by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect.' 18 U.S.C. § 4243(d)." *Wattleton*, 296 F.3d at 1197. The *Wattleton* court reviewed the applicable law:

> "[T]he two circuits that have examined the constitutionality of § 4243(d) have both found no due process violations. [Citations.]
>
> *** [I]n determining whether procedures in the civil context satisfy due process, this Court traditionally has balanced the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L.Ed.2d 18 (1976). These three *Mathews* factors are (1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' *Id.* at 335, 96 S. Ct. 893. After balancing these factors, as outlined below, we conclude that § 4243(d) is constitutional.
>
> As to the first *Mathews* factor, '[i]t is clear that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." ' *Jones v. United States*, 463 U.S. 354, 361, 103 S. Ct. 3043, 77 L.Ed.2d 694 (1983) (quoting *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L.Ed.2d 323 (1979)). The private interest at issue is also the 'stigma' of being placed in a mental institution for an indefinite duration. See *Addington*, 441 U.S. at 425-26, 99 S. Ct. 1804.
>
> Countervailing factors, however, ameliorate the negative effects on Wattleton's private interests. While committed in a 'suitable facility,' Wattleton will receive the benefits of hospitalization, care, and treatment, since a 'suitable facility' is one 'that ... provide[s] care or treatment given the nature of the offense and the characteristics of the defendant.' 18 U.S.C. § 4247(a)(2); [citation]. Moreover, the duration of Wattleton's confinement is restrained by due process. *** Since an insanity acquittee is confined to treat a mental illness and to safeguard society from danger, Wattleton may be confined only as long as he is both mentally ill and dangerous. [Citation.] Because the jury's verdict already labeled Wattleton insane, any additional social stigma due to confinement is minimal. [Citation].
>
> Turning to the second *Mathews* factor, Wattleton argues that placing the burden of proof on the insanity acquittee increases the risk of erroneous confinement decisions because, as revealed in the scientific literature, mental health experts are unable to accurately predict future dangerousness. The flaw in this argument is that the difficulty of predicting dangerousness exists regardless of which party has the burden of proof. ***

In fact, the risk of an erroneous decision is significantly reduced because a § 4243 hearing arises only after a jury finds a defendant not guilty by reason of insanity and only after all the procedural protections have been afforded the defendant in a criminal trial. *** [T]he insanity verdict in and of itself supports the conclusion that the insanity acquittee continues to be mentally ill and dangerous.

In addition, practical considerations support allocating the burden of proof to the insanity acquittee at the dangerousness hearing. In making its decision, the court relies on mental health experts' recommendations and reports concerning the insanity acquittee's mental condition. Mental health experts formulate their conclusions as to an insanity acquittee's dangerousness and mental illness in part by examining the insanity acquittee. If the government were to bear the burden of proof, the accuracy of risk assessments could be impeded by an acquittee who was reluctant or unwilling to cooperate in the mental examination. By comparison, an insanity acquittee with the burden of proof has an incentive to cooperate in the mental examination.

The last *Mathews* factor is the government's interests, including its fiscal and administrative burdens. The government undoubtedly has a strong interest in safeguarding society from individuals who pose a danger to persons or property because of their mental illness. In addition, the government has an interest in avoiding relitigation of the trial at the dangerousness hearing. [Citation.] Furthermore, as described earlier, the government potentially could confront an insanity acquittee who is unwilling to cooperate in a mental examination that is necessary to obtain crucial medical information." *Wattleton*, 296 F.3d at 1198-1201.

¶ 22 The *Wolst* court found the reasoning of *Wattleton* fully applicable to the argument concerning the constitutionality of section 5-2-4(g). Gunderson argues that we should not follow the decisions in *Wattleton* and *Wolst* because of new research concerning antipsychotic medications and new research suggesting that "schizophrenia" does not label a single disease. Rather, psychiatrists use the label for several different diseases "with quite different trajectories," properly treated by very different medical regimens.

¶ 23 Gunderson presented evidence of the research to the trial court. We do not see any grounds for holding that the scientific research affects the question of whether the due process clause requires the State to bear the burden of proof in proceedings for discharge. If the scientific evidence provides grounds for changing the burdens established in section 5-2-4, Gunderson should present the evidence and argument to the General Assembly and seek an amendment of section 5-2-4.

¶ 24 We agree with the *Wolst* court and the reasoning of *Wattleton*. We find section 5-2-4(g) of the Code constitutional. Accordingly, we affirm the trial court's decision denying Gunderson's motion for discharge.

¶ 25                                                           CONCLUSION

¶ 26 Gunderson's evidence makes a *prima facie* showing that he no longer suffers from a mental illness. Thus, we must address his argument that section 5-2-4 of the Code violates Gunderson's right to due process because it requires him to present clear and convincing evidence that he no longer meets the criteria for involuntary commitment before he can obtain discharge from the custody of DHS. Following *Wolst* and *Wattleton*, we hold that section 5-2-4 of the Code does not violate Gunderson's right to due process. Accordingly, we affirm the trial

court's judgment.

¶ 27　　　　　Affirmed.