**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 27 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JAY BRADLEY GILGERT,

Defendant-Appellant.

No. 02-4021

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:01-CR-525K)**

---

Scott Keith Wilson, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender, and Kevin L. Sundwall, Assistant Federal Public Defender, with him on the briefs), Salt Lake City, Utah for Defendant-Appellant Jay Bradley Gilgert.

Wayne T. Dance, Assistant United States Attorney (Paul M. Warner, United States Attorney, with him on the brief), Salt Lake City, Utah for Plaintiff-Appellee United States of America.

---

Before **KELLY** , **BALDOCK** , and **HENRY** , Circuit Judges.

---

**HENRY** , Circuit Judge.

---

Jay Bradley Gilgert pleaded not guilty by reason of insanity to making a threat against the President of the United States in violation of 18 U.S.C. § 871. After a hearing, the district court found that Mr. Gilgert had failed to prove that his release into the community "would not create a substantial risk of bodily injury to another person" under 18 U.S.C. § 4243(e) and committed Mr. Gilgert to the custody of the Attorney General of the United States.

On Mr. Gilgert's appeal, we confront three issues: (1) the applicable standard of review; (2) the applicable evidentiary standard; and (3) whether the district court's finding on the merits of Mr. Gilgert's request for release constitutes reversible error. As to the first two issues, we hold that clear error review applies and that Mr. Gilgert must prove that he meets the standard under § 4243 by clear and convincing evidence. Applying these standards to the merits, we hold that the district court did not clearly err and therefore affirm.

## I. BACKGROUND

### A. The Conduct, the Indictment, and the Plea

Prior to his arrest, Mr. Gilgert was a part-time janitor who was an outpatient at the Valley Mental Health Hospital in Salt Lake City, Utah. On March 28, 2001, Mr. Gilgert telephoned a counselor at the hospital and left a voice message, in which Mr. Gilgert "threatened to kill President [George W.] Bush," as

well as Mr. Gilgert's case manager and the facility manager, if "action was not taken" on his behalf. Rec vol. IV, def's ex. A, at 1 (Memorandum of Record re "Jay B. Gilgert threat against President Bush, case workers," dated March 28, 2001). Subsequently, a federal grand jury indicted Mr. Gilgert for making, "[o]n or about March 28, 2001, a threat to inflict bodily harm against the President of the United States [] in violation of 18 U.S.C. § 871(a)." Rec. vol. 1, doc. 16, at 1-2 (Indictment, filed Sept. 12, 2001). Mr. Gilgert waived his right to trial and entered a plea of not guilty only by reason of insanity. The district court accepted Mr. Gilgert's plea, finding him not guilty only by reason of insanity. After a hearing, the district court ordered Mr. Gilgert committed to a mental hospital for a psychological examination and report.

B.    The Evidentiary Hearing

After Mr. Gilgert had been examined at a mental hospital, the district court held an evidentiary hearing to determine whether Mr. Gilgert's release into the community would "create a substantial risk of bodily injury to another person" under 18 U.S.C. § 4243(e). Mr. Gilgert was present and medicated at the evidentiary hearing, and addressed the district court on several occasions. In one exchange at the hearing, Mr. Gilgert interrupted the district court, inexplicably mentioned the actress Bridget Fonda, and said to the district court, "[y]ou can't

investigate and frame me like this." Rec. vol. II, doc. 1, at 10 (Transcript of Hr'g dated Jan. 14, 2002).

At the hearing, the parties disputed both which evidentiary standard applied and whether Mr. Gilgert satisfied whichever standard applied. The parties stipulated as to the admission of four documents: (1) a Secret Service Memorandum of Record; (2) a Secret Service Report; (3) a Forensic Evaluation Report; and (4) a Risk Assessment Report. Mr. Gilgert produced no other evidence or witnesses at the hearing. Because the district court relied on these four documents in making its finding, we summarize their contents in some detail.

### 1. Secret Service Memorandum of Record

The Secret Service Memorandum of Record briefly recounts the events leading up to the charge levied against Mr. Gilgert. The memorandum states that Mr. Gilgert phoned Valley Mental Health and "threatened to kill President Bush, Kevin (Mr. Gilgert's case manager), and Aura Snarr [manager of Valley Mental Health] if action was not taken." Rec vol. IV, def's ex. A, at 1 (Memorandum of Record, dated March 28, 2001).

The memorandum also discusses Mr. Gilgert's criminal and mental health record. The report states that (1) "Mr. Gilgert has a history of violence[,] particularly if he is not taking his medication;" (2) his medical records indicate that he "has made several threats against U.S. Secret Service protectees in the

past;" (3) Valley Mental Health personnel have received unconfirmed reports that he "was or is involved in the production of pipe bombs;" (4) "Mr. Gilgert has an extensive criminal history with multiple arrests;" and (5) that he "has been investigated numerous times (12) by the U.S. Secret Service." Id.

2. **Secret Service Investigative Report**

A secret service investigative report summarizes Mr. Gilgert's offense conduct and the statements made by Mr. Gilgert to secret service agents in an interview. The report states that because of both Mr. Gilgert's threats at Valley Mental Health that he "needed to kill someone," and "his violence toward treatment workers in the past," Valley Mental Health has refused to provide Mr. Gilgert with further treatment. Rec. vol. IV, def's Ex. B, at 2 (Electronic Memorandum re Jay Bradley Gilgert, dated Apr. 17, 2001). According to the report, "[Mr.] Gilgert makes threats . . . due to irregular or lack of medication." Id. The report describes Mr. Gilgert as "extremely manic and agitated," and states that he "rambled from topic to topic and was insistent that the government was wiretapping his phone calls and stealing things from his living quarters." Id. at 4. The report further states that although agents obtained a written statement from Mr. Gilgert that he did "not intend to harm or want to kill P. Bush," Mr. Gilgert immediately became "[h]ostile" and "shout[ed] that he did not have to

incriminate himself and then tore up the piece of paper" containing the statement. Id.

Despite the evidence of Mr. Gilgert's manic conduct and making of threats, the report concluded, apparently because "[t]reatment workers state that [Mr.] Gilgert is compliant when following his medical prescriptions," that he "does not pose a threat to any USSS [United States Secret Service] protectee at this time." Id. at 5.

### 3.    Forensic Evaluation Report

The district court requested a forensic evaluation to determine whether "[Mr.] Gilgert is suffering from a mental disease or defect rendering him incompetent to the extent that he is unable to understand the nature and consequences of the court proceedings against him or to assist counsel properly in his defense, and whether or not he was insane at the time of the offense." Rec. vol. IV, def's Ex. 1C, at 1 (Forensic Evaluation, dated Aug. 29, 2001) .

Dr. Ralph Ihle, a forensic psychologist, evaluated Mr. Gilgert and concluded that "[Mr.] Gilgert evidenced severe and long-standing symptoms of a psychotic disorder," and "experienced grandiose and persecutory delusions about 'government conspiracies,'" and about "knowing [of] assassination plans against presidents." Id. at 13. Dr. Ihle's report noted that Mr. Gilgert was diagnosed with paranoid schizophrenia, which involves "delusions or auditory hallucinations

in the context of a relative preservation of cognitive functioning and affect," id.,
that such "[d]elusions are typically persecutory or grandiose," id., and that "the
combination of persecutory and grandiose delusions with anger may predispose
the individual to violence." Id. Dr. Ihle explained that "when Mr. Gilgert has an
unstable mental condition, he begins to exhibit grossly disorganized thought,
becomes actively delusional, hallucinates, and becomes agitated and engages in
behavior that may be intimidating or threatening toward others." Id. In addition,
Dr. Ihle found that Mr. Gilgert's "use of alcohol and illicit substances may serve
to potentiate decompensation[1] in his mental status and his degree of danger to
others or property." Id. at 13-14.

The report concluded that "Mr. Gilgert suffers from a significant mental
disorder and was impaired at the time of the offense," and recommended that he
be "committed for hospitalization at a federal medical center." Id. at 14 & 15.

### 4. Risk Assessment Report

---

[1] "Potentiate decompensation," in this context, appears to be jargon for,
roughly, "limit the improvement." "Potentiate" is defined as "[t]o increase the
effect of." XII The Oxford English Dictionary 225 (2d ed. 1989).
"Decompensation" refers to "a state or condition of having lost compensation."
Id., vol. IV, at 344. "Compensation," in turn, is defined in this context as "those
conditions by which the effects of congenital or acquired disease are warded off."
Id., vol. III, at 602.

By order of the district court, a panel at the United States Medical Center for federal prisoners in Springfield, Missouri consisting of the chief of psychiatry, a supervisory social worker, and a staff psychologist, convened to determine "whether the release of Mr. Gilgert would present a substantial risk of bodily injury to others or serious damage to the property of others." Rec. vol. IV, def's ex. D, at 1 (Risk Assessment, dated Dec. 14, 2001). The panel's risk assessment report noted that Mr. Gilgert's hospital records indicate that he has received a "diagnosis of chronic paranoid schizophrenia," has a "history of explosive threatening statements toward individuals [at Valley Mental Health]," and that Mr. Gilgert's "threat[s] to bomb buildings in Salt Lake City" had led to his hospitalization at the Utah State Hospital for two years in 1997. Id. at 2.[2] The report stated that hospital records "make reference to an [unsubstantiated] allegation that "pipe bomb paraphernalia was found in Mr. Gilgert's apartment by one of their staff members" following his 1997 hospitalization. Id. The report further observed that Mr. Gilgert is "inconsistent" in taking his medication, id., has "threatened two of [the hospital's] staff members along with President Bush," id., "has a history of cocaine abuse," id., and has an "extensive" criminal history dating back over twenty-five years. Id. at 3. The report memorialized the panel

---

[2] For reasons not clear from the appellate record, the risk assessment panel was unable to obtain records regarding the Utah hospitalization. See Rec. vol. IV, def's ex. D, at 1.

members' observations that while at Springfield Medical Center for evaluation, Mr. Gilgert became "more agitated," "made delusional accusations against staff," and "appeared physically threatening." Id. at 4.

The panel's report concluded that Mr. Gilgert "remains acutely psychotic," and that his release "would [create] a substantial risk of bodily injury to another person or serious damage to the property of another due to his present mental disease or defect." Id. at 5. The report further concluded that Mr. Gilgert "is in need of continued inpatient mental health care at the present time." Id.

## C.     The District Court's Order

Following the hearing, the district court issued an order, finding it "unnecessary to decide which burden of proof is applicable" because Mr. Gilgert "cannot meet either burden of proof." Rec. vol. I, doc. 33, at 2 (Order, filed Jan. 31, 2002). The district court stated:

> Relying upon the complete file, including the briefs and arguments of counsel, and Exhibits [], the Court finds that defendant's release would create a substantial risk of bodily injury to another person or serious damage of property of another due to present mental disease or defect.

Id.

The district court, which made no further findings of fact, ordered Mr. Gilgert committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4243(e).

This appeal followed.

-9-

## II. DISCUSSION

**A.      Standard of Review**

On appeal, the parties dispute the threshold issue of which standard of review applies to the district court's decision applying § 4243.  Section 4243 provides in part:

> (d) . . . a person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a substantial risk of such injury or damage, has the burden of proving by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect. With respect to any other offense, the person has the burden of such proof by a preponderance of the evidence.
> (e) If, after the hearing, the court fails to find . . . that the person's release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect, the court shall commit the person to the custody of the Attorney General.

18 U.S.C. § 4243.  This circuit has never decided what standard of review applies to a finding of dangerousness.[3]  Mr. Gilgert argues that a district court's

---

[3] For ease of reference, we use the term "finding of dangerousness" to refer to the district court's finding that Mr. Gilgert failed to show, under the statute's somewhat awkwardly phrased double-negative standard, that "the person's release would not create a substantial risk of bodily injury to another person or serious

(continued...)

finding of dangerousness under § 4243 is a question of law subject to de novo review. He argues that we should analogize from either our rule for the review of a determination of reasonableness of a search and seizure or from our rule for the review of a finding of competence to stand trial, and should therefore apply de novo review. The government counters that a finding of dangerousness is primarily factual and that the proper standard of review is therefore clear error.

The weight of relevant authority decisively favors clear error review. The three courts of appeal to reach this issue – the Fifth, Eighth and Eleventh Circuits – have each held that clear error review governs. See United States v. Wattleton, 296 F.3d 1184, 1201 n.34 (11th Cir. 2002) ("Other circuits have reviewed a district court's dangerousness findings under the clearly erroneous standard. . . . Therefore, we apply a clearly erroneous standard in reviewing the district court's dangerousness findings.") (internal citations omitted); United States v. Jackson, 19 F.3d 1003, 1007 (5th Cir. 1994) ("We now join the Eighth Circuit Court of Appeals and hold that the district court's conclusion that [the defendant] failed to prove he was entitled to release is a finding of fact which can be reversed only if clearly erroneous.") (citing United States v. Steil, 916 F.2d 485, 487-88 (8th Cir. 1990)). In contrast, we are not aware of a single

_____

[3](...continued)
damage of property of another due to a present mental disease or defect."  18 U.S.C. § 4243.

-11-

decision or academic commentary advocating de novo review of a finding of dangerousness.

We are persuaded that the principle underlying these holdings that clear error review applies to a finding of dangerousness is a sound one, one of deference to the trial judge's assessment after a hearing of whether the public needs protection from the danger posed by a defendant's mental illness. See United States v. Jain, 174 F.3d 892, 898 (7th Cir. 1999) ("Given that 'it is impossible to predict how long it will take for any given individual to recover – or indeed whether he ever will recover, district courts generally are accorded great latitude when determining whether a mentally ill defendant is ready to be released"); United States v. Bilyk, 949 F.2d 259, 261 (8th Cir. 1991) ("Given the trial judge's awesome responsibility to the public to ensure that a clinical patient's release is safe, the district court may reject experts' conclusions when their reasoning supports different results") (internal quotation marks and citation omitted). Indeed, in this case, although we have the benefit of reviewing the transcripts of the district court proceedings, we can not, as the district court did, evaluate Mr. Gilgert's demeanor and behavior in person. Accord Maggio v. Fulford, 462 U.S. 111, 118 (1983) (stating that "the original trier of the facts holds a position of advantage from which appellate judges are excluded" and that therefore, "[i]n doubtful cases the exercise of his power of observation often

proves the most accurate method of ascertaining the truth") (quoting United States v. Oregon Medical Society, 343 U.S. 326, 339 (1952).

Thus, we join our sister circuits and hold that clear error review applies to a district court's finding of dangerousness under § 4243. We conclude, following our sister circuits, that a finding of dangerousness is a "finding of fact." Jackson, 19 F.3d at 1006. However, even assuming that, as Mr. Gilgert asserts, a finding of dangerousness is a mixed application of law to fact, "we apply the clearly erroneous standard ... . [b]ecause the district court is 'better positioned' than we are to decide this primarily factual issue." Frymire v. Ampex Corp., 61 F.3d 757, 765 (10th Cir. 1995) (quoting Salve Regina College v. Russell, 499 U.S. 225, 233 (1991)).

In so holding, we decline Mr. Gilgert's invitation to analogize from our standard of review for a motion to suppress, where we review findings of facts for clear error, but we review the application of the legal standard of "reasonableness" de novo. See United States v. Olguin-Rivera, 168 F.3d 1203, 1204 (10th Cir. 1999). Mr. Gilgert argues that "[b]ecause the court's evaluation of the facts in this proceeding results in a significant deprivation of constitutionally guaranteed liberty, this court's review of the adequacy of the evidence to support the district court's dangerousness evaluation likewise cannot be separated from its determination of the legal scope of the dangerousness

-13-

standard." Aplt's Reply Br. at 2-3. We assume that *had* Mr. Gilgert challenged the commitment procedures employed by the government on constitutional grounds, our review of the district court's conclusion of law regarding the constitutional challenge would be de novo, although we note that the three "circuits that have examined the constitutionality of § 4243(d) have [each] found no due process violations." Wattleton, 296 F.3d at 1198. However, Mr. Gilgert did not raise any such challenge below, nor does he on appeal. Instead, his appeal challenges the district court's finding of dangerousness, an inquiry that, as discussed above, is a factual one best performed by the district court.

Further, we note that even if we did adopt Mr. Gilgert's alternative suggestion that we analogize from our standard of review for findings of competence to stand trial, *that* rule in our circuit, contrary to Mr. Gilgert's assertions, mandates clear error review. See United States v. Pompey, 264 F.3d 1176, 1178 (10th Cir. 2001) ("Competency to stand trial is a factual determination that can be set aside only if it is *clearly erroneous*.") (quoting United States v. Boigegrain, 155 F.3d 1181, 1189 (10th Cir. 1998) (emphasis added)). Accord Maggio v. Fulford, 462 U.S. at 117 (describing a finding of competence as a "factual conclusion[]"); Lafferty v. Cook, 949 F.2d 1546, 1549 (10th Cir. 1991) ("competency is a factual issue").

**B.     Evidentiary Standard**

-14-

The parties also dispute which evidentiary standard applies under 18 U.S.C. § 4243(d) where the defendant was convicted of making a threat against the president in violation of 18 U.S.C. § 871. The district court did not rule on the applicable evidentiary standard, finding that Mr. Gilgert failed to satisfy the statute *either* by a preponderance of the evidence or by a clear and convincing showing. Thus, our analysis is de novo. See Allison v. Bank-One Denver, 289 F.3d 1223, 1235 n.2 (10th Cir. 2002) (noting that the "construction and applicability of a federal statute is a question of law, which we review de novo") (quotation marks and citation omitted).

This issue has not been addressed by our circuit or, with the exception of one unpublished Ninth Circuit decision discussed below, by any federal court decision. We begin then with the statute itself.

Section 4243(d) provides the test for which evidentiary standard applies in a hearing on whether a defendant's release would be dangerous:

> [A] person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a substantial risk of such injury or damage, has the burden of proving by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect. With respect to any other offense, the person has the burden of such proof by a preponderance of the evidence.
>
> 18 U.S.C. § 4243.

-15-

Thus, under the terms of the statute, the applicable evidentiary burden that Mr. Gilgert must satisfy turns, not on any fact particular to Mr. Gilgert, but, rather, whether, as a general matter, the crime of making a threat against the president in violation of § 871 involves "bodily injury to, or serious damage to the property of, another person, or . . . a substantial risk of such injury or damage." Id.

Certain crimes rather clearly do or do not satisfy the "injury" / "damage" / "substantial risk" standard. Compare Jackson, 19 F.3d at 1007 (in § 4243 hearing, defendant found not guilty only by reason of insanity on charge of armed robbery bore "burden to prove by clear and convincing evidence" that he met the § 4243(d) standard) (internal quotation marks omitted) with Bilyk, 949 F.2d at 261 (requiring a defendant charged with being a felon in possession of a firearm, based on police officers' discovering the gun in a drawer in the defendant's house, to satisfy the standard "by a preponderance of the evidence").

In contrast, threats do not map easily onto the taxonomy of crimes created by § 4243. A threat is a "communicated intent to inflict physical or other harm on any person or property." Black's Law Dictionary 1480 (6th ed. 1990) (quoted in United States v. Gottlieb, 140 F.3d 865, 872 (10th Cir. 1998)). It is therefore somewhat difficult to determine whether threats as a class fit the statutory test of § 4243 because threats "do not seem to fall squarely within either the violent or non-violent category of crimes." Jeremy D. Feinstein, Are Threats Always

Violent Crimes?, 94 Mich. L. Rev. 1067, 1068-69 (1996). As the district court stated, "as to whether defendant's burden is clear and convincing or by a preponderance[,] the law is somewhat hazy on this point." Rec. vol. 1, doc. 33, at 1 (Order, filed Jan. 31, 2002). Indeed, our research yielded only one case where a court addressed the evidentiary standard applicable to a § 4243 hearing for a defendant charged with making a threat against the President. See United States v. Craig, No. 90-55450, 1992 WL 129791 (9th Cir. June 12, 1992). There, in an unpublished decision affirming the denial of a habeas petition filed by a defendant committed under § 4243 to the Attorney General's custody, the Ninth Circuit noted that the district court had applied the clear and convincing burden of proof standard to the § 4243(d) determination at issue. Without offering any analysis, the Ninth Circuit implied that the clear and convincing standard applied, stating, "we agree with the district court that Craig has failed to meet this burden." Id. at *1.

Although the parties' briefs in this case similarly offer no analysis on the applicable evidentiary standard beyond their conclusory assertions that the burden favorable to their position applies, we will try to clear the haze. As one commentator observed, "the federal courts of appeals have split regarding whether threats ever may be considered non-violent offenses." Feinstein, 94 Mich. L. Rev. at 1068 n.9 (collecting cases). Fortunately, though, the uniqueness

of the crime of making a threat against the president allows us to formulate a rule without entering into the thicket of the debate on the classification of threats in general. *That* crime is "qualitatively different from a threat against a private citizen or other public official" because the specter of "[a] [p]resident's death in office has worldwide repercussions and affects the security and future of the entire nation." United States v. Twine, 853 F.2d 676, 681 (9th Cir. 1988) (quotation omitted).

Indeed, the statute now codified at 18 U.S.C. § 871 was passed in February 1917, as our nation prepared to enter World War I. Months later, a federal district court, in upholding the statute against a constitutional challenge, explained the evil that Congress sought to remedy by enacting the statute. See United States v. Stickrath, 242 F. 151, 153 (S.D. Ohio 1917) (cited with approval in Pierce v. United States, 365 F.2d 292, 296 (10th Cir. 1966). The court explained that a threat against the President "incites the hostile and evil-minded to take the President's life," "is an affront to all loyal and right-thinking persons, inflames their minds," and "provokes resentment, disorder and violence." Stickrath, 242 F. at 153.

We might state the effect somewhat differently today. Regardless, we think it remains true that beyond any risk a threat against the president may pose to the president directly, such a threat creates a serious risk to those officers,

people, and property in the vicinity of the maker of the threat, as well as to the maker of the threat himself, whether competent or not.  The risk stems from the potentially extreme reaction by law enforcement officers or ordinary citizens that a threat against our nation's commander-in-chief and chief executive officer threatens to engender.

Accordingly, the crime of making a threat against the President of the United States in violation of 18 U.S.C. § 871 necessarily involves a substantial risk of bodily injury to another person or damage to another person's property. We therefore hold that a defendant who pleads not guilty by reason of insanity to making a threat against the president in violation of § 871 is required in a § 4243(e) hearing to prove by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person, or of serious damage to the property of another person, due to mental disease or defect afflicting the defendant at that time.

**C.    The Merits of the District Court's Finding of Dangerousness**

Having resolved the two threshold issues of the applicable standard of review and evidentiary burden, we turn to the merits of the district court's application of § 4243 to Mr. Gilgert's case.  Applying the proper standard of review and evidentiary burden, the question on the merits is whether the district court clearly erred in finding that Mr. Gilgert failed to prove by clear and

convincing evidence that his release would not "create a substantial risk of bodily injury to another person" under § 4243(e).

A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court, on [review of] the entire record, is left with the definite and firm conviction that a mistake has been committed." United States v. De la Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).  On clear error review, our role is not to re-weigh the evidence; rather, our review of the district court's finding is "significantly deferential."  Concrete Pipe & Prod. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S 602, 623 (1993).

Mr. Gilgert argues that the district court erred because the evidence shows almost uniformly that "he is not violent and his release would not present a danger to people or property."  Aplt's Br. at 12.  In response to the district court's reliance on the expert reports in concluding that Mr. Gilgert had failed to satisfy the statutory standard, Mr. Gilgert contends that "[t]he common theme throughout the reports is that making threats is the way Mr. Gilgert attempts to get help when his medication is not properly adjusted, rather than an actual indication of an intent to take action."  Id. at 13.

Mr. Gilgert's arguments fail to recognize both that the statute places the evidentiary burden on *him* and that on clear error review, our role is not to re-

weigh the evidence. Far from concluding that the district court erred, we conclude that the district court's finding was amply supported. In his forensic evaluation report, Dr. Ihle concluded that Mr. Gilgert "engages in behavior that may be threatening to others," Rec vol. IV, def's ex. C, at 13, that Mr. Gilgert's use of alcohol and illicit substances may increase "his degree of danger to others or property," id. at 14, and that Mr. Gilgert's "combination of persecutory and grandiose delusions with anger may predispose [him] to violence." Id. at 13. After reviewing Mr. Gilgert's medical records, interviewing him, and observing him on his ward, the three clinical professionals on the risk assessment panel charged specifically with assessing the risks associated with Mr. Gilgert's possible release concluded that he "remains acutely psychotic" and that his release "would [create] a substantial risk of bodily injury to another person or serious damage to the property of another due to his present mental disease or defect." Rec. vol. IV, def's ex. D, at 5. Moreover, the risk assessment panel found that Mr. Gilgert "is in need of continued inpatient mental health care at the present time." Id.

Mr. Gilgert's counsel placed no evidence to the contrary into evidence and, as his counsel acknowledged at oral argument, did not attempt to impeach through cross-examination the authors of the four reports placed in evidence, despite the opportunity to do so. The district court, based on its own observation

of Mr. Gilgert, and on its review of the stipulated reports, reached the same conclusion as the risk assessment panel.

We emphasize that in no respect do we wish to stigmatize the many members of our society who grapple with mental health issues. Such stigma was emblematic of centuries of discrimination against the mentally ill that our nation has, for the most part, fortunately outgrown. A finding of insanity, or even one of acutely delusional behavior, does not, without more, establish that a person is dangerous to the community.

Nonetheless, the record in this case compels us to hold that the district court did not clearly err in finding that Mr. Gilgert failed to meet his burden to demonstrate by clear and convincing evidence that his release would not "create a substantial risk of bodily injury to another person" under 18 U.S.C. § 4243(e). See Steil, 916 F.2d at 488 (affirming finding of dangerousness where "medical health professionals have found [the defendant] mentally ill *and dangerous*, and there is no medical opinion to the contrary in the record before us") (emphasis added). Not only are we *not* left with a "firm and definite conviction" that the district court erred, De la Cruz-Tapia, 162 F.3d at 1277, but we do not see how the district court could have ruled otherwise, given the lack of any professional medical opinion in the record that Mr. Gilgert's release would not present a danger to the community.

-22-

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's finding that Mr. Gilgert failed to prove that his release into the community would not "create a substantial risk of bodily injury to another person" under 18 U.S.C. § 4243 and AFFIRM the district court's consequent commitment of Mr. Gilgert to the custody of the Attorney General of the United States.