**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 16 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JASON M. WEED,

Defendant-Appellant.

No. 03-5100

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. CR-02-10-K)**

---

Barry L. Derryberry, Federal Public Defender (Julia L. O'Connell, Assistant Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Tulsa, Oklahoma, for Defendant-Appellant.

Kevin C. Danielson, Assistant United States Attorney (David E. O'Meilia, United States Attorney, with him on the brief), Office of the United States Attorney, Tulsa, Oklahoma, for Plaintiff-Appellee.

---

Before **O'BRIEN** , **HOLLOWAY** , and **TYMKOVICH** , Circuit Judges.

---

**TYMKOVICH** , Circuit Judge.

---

On December 12, 2001, twenty-seven year old Jason Weed walked outside his Tulsa, Oklahoma, apartment complex and fired two handgun rounds at a postal

worker. The second shot struck and killed the victim. Weed, who had no history of mental illness, was peaceably apprehended and charged with the murder of a federal employee. Prior to the nonjury trial, Weed and the government stipulated that Weed was insane at the time of the shooting. Following the trial, the district court judge found Weed not guilty by reason of insanity and committed him to a mental health institution.

In May 2003, seventeen months after the shooting, the district court held a commitment hearing as required by statute to determine whether Weed was entitled to release under 18 U.S.C. § 4243 (2000), the federal statute governing commitment of persons found not guilty by reason of insanity. Mental health experts from both sides testified that Weed suffered from a psychotic episode at the time of the shooting, but that his symptoms had since disappeared. Both sides' experts also agreed that Weed may still have a latent mental illness or disorder that had not been triggered since the time of the crime. Based on the evidence presented at the commitment hearing, the district court found that Weed had failed to prove by clear and convincing evidence that his release into the community would not create a substantial risk of danger to others, and committed him to the custody of the Attorney General of the United States.

On appeal, we must decide (1) whether Congress violates the due process rights of insanity acquittees by requiring them to prove their entitlement to release

by a clear and convincing burden of proof; (2) whether Congress violates equal protection by placing a higher burden of proof for release on the class of insanity acquittees who have committed serious crimes; and (3) whether the district court clearly erred in finding Weed had not met the statutory standard for release.

We hold that the clear and convincing burden of proof under 18 U.S.C. § 4243(d) does not violate the Constitution, and that the district court did not commit reversible error in ordering Weed's continued confinement. Therefore, we affirm.

## I. Background

### A. The Shooting and the Charges

On the morning of December 12, 2001, Jason Weed calmly walked from his apartment building and, with no apparent provocation, shot and killed United States Postal Service employee Robert Jenkins as the letter carrier made his daily rounds. Tulsa police responded and quickly arrested Weed, who was found in a disoriented state several blocks from the shooting. Witnesses said Weed was acting very strangely at the time of his arrest, refusing to respond to officers' questions and singing "Jingle Bells."

The videotape officers took of Weed's post-arrest interrogation captured his

strange behavior. [1]  In the video, Weed alternates between extreme laughter and anger and makes numerous unresponsive and irrational statements.  At times he appears calm and coherent, and at others his behavior is erratic and his speech incomprehensible.  Weed became so incoherent and agitated that officers eventually stopped their questioning.

Weed was subsequently charged with the murder of a federal employee and use of a firearm in connection with a crime of violence, in violation of 18 U.S.C. §§ 1111 and 1114, and 18 U.S.C. § 924(c).    He was detained in a federal medical center pending trial and evaluated for competency at the request of both his attorney and the prosecution.

## B.  The Trial

The district court held a nonjury trial in August 2002.  Based on the psychological evaluations previously conducted, the parties stipulated that Weed had committed the crimes charged and that Weed had suffered from a mental disorder at the time of the offense that rendered him unable to appreciate the nature of his actions.  After a hearing, the district court entered a special verdict finding Weed not guilty by reason of insanity and ordered him committed to a mental hospital for further psychological examination as required by 18 U.S.C.

---

[1] Weed's motion to supplement the record on appeal with the videotape, Plaintiff's Exhibit A in the district court, is granted pursuant to Tenth Circuit Rule 10.3(D)(4).  We have reviewed the videotape as part of the record.

§ 4243(a)–(b). [2]

## C. The Commitment Hearing

In May 2003, nine months after Weed's acquittal by reason of insanity, the district court held an evidentiary hearing as required by 18 U.S.C. § 4243(c). [3] The purpose of the hearing was to determine whether Weed could prove by clear and convincing evidence that his release into the community would not create a "substantial risk of bodily injury to another person." 18 U.S.C. § 4243(d) and (e). Before the hearing, the district court denied Weed's motion to strike as unconstitutional the clear and convincing evidence standard contained in

---

[2] Section 4243 provides, as pertinent here:

> (a) Determination of present mental condition of acquitted person.—If a person is found not guilty only by reason of insanity at the time of the offense charged, he shall be committed to a suitable facility until such time as he is eligible for release pursuant to subsection (e).

> (b) Psychiatric or psychological examination and report.—Prior to the date of the hearing, pursuant to subsection (c), the court shall order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c).

[3] Section 4243(c) states: "A hearing shall be conducted . . . and shall take place not later than forty days following the special verdict." In this case, the hearing did not occur within forty days due to several motions to continue at Weed's request.

-5-

§ 4243(d). The court received both testimonial and written evidence at the hearing on whether Weed met the statutory standard for release. We summarize that evidence in detail here.

### 1. Testimony of Dr. Curtis Grundy (for Weed)

Dr. Curtis Grundy is a licensed Oklahoma psychologist who first evaluated Weed to determine whether he was competent to stand trial. (IV R.O.A. at 11–12) Beginning five days after the offense, Dr. Grundy administered numerous psychological tests, reviewed the videotape of Weed after his arrest, interviewed Weed's friends and relatives about his behavior prior to the shooting, and reviewed Weed's records from the federal medical center where he was detained. (*Id*. at 15–19) Dr. Grundy testified that Weed displayed symptoms of psychosis at the time of the shooting, including visual and auditory hallucinations, paranoia, delusions, and severe agitation. ( *Id*. at 19–20) He explained that although Weed demonstrated significant mental status impairment during the initial evaluative session, "over the course of December 2001[] his symptoms were abating or resolving." ( *Id*. at 19) He therefore diagnosed Weed as having suffered from a brief psychotic disorder and noted that Weed showed no signs of "malingering," or feigning symptoms of mental illness for secondary gain. ( *Id*. at 17, 29)

In December 2002, approximately one year after the crime, Dr. Grundy performed additional psychological tests in preparation for Weed's commitment

hearing. These tests included a clinical interview and mental status evaluation to rate Weed for psychopathy and violence. ( *Id*. at 20) At the hearing, Dr. Grundy testified that Weed's psychotic symptoms had not recurred since December 2001, and that he currently met no *Diagnostic and Statistical Manual of Mental Disorders-IV* (DSM-IV)[4] criteria for mental disease. ( *Id*. at 19, 21) In Dr. Grundy's opinion, Weed's brief psychotic disorder was caused by a mental defect. The exact nature of the defect, however, is unknown. ( *Id*. at 29, 32) Dr. Grundy testified that none of the tests he relied upon could predict whether Weed will experience another onset of symptoms. ( *Id*. at 35) He also testified that, according to the DSM-IV, recurrence of a brief psychotic disorder is rare. ( *Id*. at 33)

On cross-examination, Dr. Grundy agreed that a person who has suffered an onset of psychosis is more likely to suffer another occurrence and presents a greater risk to the public than someone who has never had such a condition. ( *Id*. at 43) Finally, Dr. Grundy stated the potential exists that Weed may still have the mental defect, but that it has not been triggered since December 2001. ( *Id*. at 33–34)

---

[4] The *Diagnostic and Statistical Manual of Mental Disorders-IV* is the definitive source for the classification of mental illnesses. *See* American Psychiatric Association, *The Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994).

2. Testimony of Dr. Harrison Pope (for the Government)

The district court certified Dr. Harrison Pope, a Harvard Medical School psychiatrist, as an expert in psychotic disorders. ( *Id*. at 74) As a professor of psychiatry, Dr. Pope helped draft the diagnostic criteria for psychotic disorders used in the DSM-III and DSM-IV, and has written and lectured on the psychiatric effects of steroid use. ( *Id*. at 77, 96) In preparation for his testimony, Dr. Pope interviewed Weed by phone, read reports on his condition, watched the videotape taken after Weed's arrest, and reviewed testimony of people who had been with Weed just prior to his psychotic episode. ( *Id*. at 81, 93) In addition, he listened to conversations Weed had with his mother while he was in jail. ( *Id*. at 81, 92)

At the hearing, Dr. Pope testified that Weed had a brief psychotic disorder with "prominent manic features." ( *Id*. at 95, 106) In Dr. Pope's opinion, Weed's previous steroid use and participation in an exhaustive self-awareness program the week prior to the shooting could be ruled out as causes of the psychotic break, leaving only "very rare possibilities" as the triggering factors. ( *Id*. at 97, 98) According to Dr. Pope's hypothesis, Weed's psychotic episode may have developed from a seizure deep in the brain called a "complex partial seizure." ( *Id*. at 99) However, he could not with reasonable medical certainty say that this was the cause. ( *Id*. at 111–12) If seizure was in fact the cause, Dr. Pope testified that Weed is more vulnerable than the average person to having another seizure, but he

-8-

also stated that the odds of recurrence lessen as time passes. ( *Id*. at 102–03)

Finally, although Dr. Pope testified that Weed does not currently exhibit any symptoms of psychosis, he clarified, "that [statement] should not be interpreted that I'm guaranteeing that he will never again have symptoms because I cannot say that with confidence." ( *Id*. at 121–22)

### 3. Certificate of Mental Disease or Defect and Dangerousness

In addition to the testimony, the government introduced into evidence a psychiatric report, titled "Certificate of Mental Disease or Defect and Dangerousness," as required by 18 U.S.C. § 4243(b). The report was produced by the Bureau of Prisons (BOP) and signed by the warden of the federal facility housing Weed. (Appellant's Addendum of Exhibits, Exh. F). The report informed the court that the mental health workers responsible for Weed's care believed that Weed is currently suffering from a mental disease or defect that would cause him to present a substantial risk of danger to others if released. The attached forensic evaluation submitted by staff psychiatrist Bryon Herbel, M.D., and staff psychologist Robert E. Cochrane, Psy. D., diagnosed Weed as having "Brief Psychotic Disorder, In Remission." ( *Id*. at 8) The report noted that Weed demonstrated the sudden onset of manic psychotic symptoms shortly before the December 12, 2001 shooting, but found that these symptoms "remitted a few days after his arrest, following treatment with a single dose of Haldol and Ativan." ( *Id*.

at 9)

Regarding the link between risk of dangerousness and mental disease or defect, the report stated:

> Mr. Weed is not viewed as presenting an increased risk of dangerous behavior in his current mental status. However, he is viewed as presenting a high risk of dangerousness if he relapsed into another psychotic episode, which resulted in him committing homicide by shooting and killing a postal worker. The risk of any such future recurrence of a psychotic episode is unknown. Mr. Weed may not have any further such episodes in his life or he may have these episodes at some unpredictable intervals in the future.

(*Id*. at 10) Based on the "gravity of Weed's offense, the lack of data to estimate the risk of recurrence of another psychotic episode, and the lack of any clear strategies to lower this risk," the report thus concluded that Weed's current condition met the standard for commitment and recommended that he be confined for further observation. ( *Id.* )

## D. The District Court's Order

Following the hearing, the district court issued an oral ruling that was memorialized in a written order. The district court found as follows:

> The most compelling thing to me . . . [is that w]e're only some 17 months out [from the time of the shooting]. That's not a long period. That's certainly not a long enough period in which I would feel comfortable, even under certain conditions, releasing the defendant into this community.

-10-

And the second factor that the Court relies upon is the fact that the people who have been around Mr. Weed the most, who have had the most contact with him, have spent the most hours with him, have seen him day in and day out at the Federal Medical Center conclude that Mr. Weed's condition does not meet the criteria for release under [Section] 4243; that they believe that Mr. Weed does currently present a substantial risk of bodily injury to another person or serious damage to the property of another due to mental disease or defect. And that is the opinion submitted by the warden and by Dr. Herbel. And the recommendation is that Mr. Weed be confined in a Federal Medical Center for a further period of observation. (IV R.O.A. at 133–34)

The court concluded that Weed had not met his burden of proving eligibility for release under the statute, and ordered him committed to the custody of the Attorney General of the United States, where he remains to this day.

## II. The Constitutionality of Section 4243

We turn first to Weed's argument that 18 U.S.C. § 4243 violates his rights to due process and equal protection. We review the relevant statutory framework and then address each claim in turn.

In 18 U.S.C. § 4243, titled "Hospitalization of a person found not guilty only by reason of insanity," Congress established a comprehensive civil commitment procedure for insanity acquittees. *See Shannon v. United States*, 512 U.S. 573, 577 (1994). Under that procedure, a defendant found not guilty by reason of insanity is held in custody pending a court hearing that must occur within forty days of the verdict. 18 U.S.C. § 4243(a) and (c). The evidentiary

-11-

hearing is commonly referred to as either a "release" or "commitment" hearing, and is civil, not criminal, in nature. *Shannon*, 512 U.S. at 577. At that hearing, the insanity acquittee must prove (a) "by clear and convincing evidence" that (b) his release would not create a "substantial risk" to people or property due to "a present mental disease or defect." The provision reads more fully:

> a person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a substantial risk of such injury or damage, *has the burden of proving by clear and convincing evidence* that his release *would not create a substantial risk* of bodily injury to another person or serious damage of property of another due to a present mental disease or defect. With respect to any other offense, the person has the burden of such proof by a preponderance of the evidence.

18 U.S.C. § 4243(d) (emphasis added). If an acquittee fails to meet the specified burden of proof, the court commits him to the custody of the Attorney General, who in turn releases him to the appropriate state or federal officials for custody and treatment. [5] A committed person is entitled to petition the court for discharge on his own motion, so long as he waits at least 180 days after the most recent court determination that he should continue to be hospitalized. 18 U.S.C. § 4247(h).

---

[5] "If, after the hearing, the court fails to find by the standard specified in subsection (d) of this section that the person's release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect, the court shall commit the person to the custody of the Attorney General." 18 U.S.C. § 4243(e).

-12-

On appeal Weed challenges the constitutionality of the elevated burden of proof set forth in § 4243(d), arguing that the burden of proving eligibility for release by clear and convincing evidence is too high and therefore violates his right to due process under the Fifth Amendment. Weed also contends that Congress's placing a higher burden of proof on insanity acquittees who have committed more serious crimes violates equal protection.[6] Neither issue has been addressed by this circuit, nor by any published federal court decision of which we are aware. For the following reasons, we conclude that § 4243(d) does not run afoul of the Constitution.

## A. Due Process

Due process is "flexible and calls for such procedural protections as the particular situation demands." *Jones v. United States*, 463 U.S. 354, 367–68 (1983) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The function of a burden of proof, "as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S.

---

[6] "We review challenges to the constitutionality of a statute de novo." *United States v. Dorris*, 236 F.3d 582, 584 (10th Cir. 2000). "Statutes are presumed constitutional." *Id*. (citing *United States v. Morrison*, 529 U.S. 598, 607 (2000)).

418, 423 (1979) (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)). The burden of proof serves to "allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Id.* Although the determination of insanity at the time of the crime arises in a criminal proceeding, the subsequent determination of the insanity acquittee's continuing commitment arises in a civil proceeding.

In evaluating an insanity acquittee's due process rights in civil commitment proceedings, the Due Process Clause "requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jones*, 463 U.S. at 368 (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)). "The purpose of commitment following an insanity acquittal . . . is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous." *Id.* (citing *O'Connor v. Donaldson*, 422 U.S. 563, 575–76 (1975)).

With these standards in mind, we note first that Weed does not contest the statute's preliminary allocation of the burden of proof on him. While we have yet to address the specific question of allocating the burden of proof under § 4243(d), this court has found that a similar provision under Colorado law that places the burden of proof on insanity acquittees comports with due process. *See Glatz v.*

-14-

*Kort*, 807 F.2d 1514, 1519–21 (10th Cir. 1986). In addition, the three circuits that have examined § 4243(d) have found that placing the burden of proving eligibility for release on the acquittee does not violate due process. *See United States v. Wattleton*, 296 F.3d 1184, 1198 (11th Cir. 2002); *United States v. Phelps*, 955 F.2d 1258, 1267–68 (9th Cir. 1992); *United States v. Wallace*, 845 F.2d 1471, 1474–75 (8th Cir. 1988).

Instead, Weed challenges the clear and convincing burden of proof itself. In determining whether procedures comport with due process in the civil context, this court weighs the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Under the *Mathews* test, we balance (1) the private liberty interest affected, (2) the risk of an erroneous deprivation of that interest and the probable value of additional procedural safeguards, and (3) the government's interest, including the function involved and the burdens that additional procedural requirements would place on the state. *Id.* at 335.

*(1)  The Private Liberty Interest Affected*

Regarding the first *Matthews* element of whether there is a private liberty interest affected, it is well settled that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones*, 463 U.S. at 361 (quoting *Addington*, 441 U.S. at 425). In addition, insanity acquittees have an interest in avoiding the stigma associated with involuntary commitment to

a mental institution after a finding of dangerousness. *See Addington*, 441 U.S. at 425–26.

Several considerations, however, counterbalance these negative effects on Weed's private liberty interest. First, Weed himself advanced his mental condition as a defense to the crime he committed with the knowledge that a loss of liberty would result. *See Jones*, 463 U.S. at 367 n.16 (finding the significance of the deprivation of liberty is diminished, as compared to involuntary civil confinement, where defendant himself raises the insanity defense). Second, just as "[a] criminal defendant who successfully raises the insanity defense necessarily is stigmatized by the verdict itself," Weed is stigmatized by the special verdict entered by the court after the parties stipulated to insanity at trial. *Id.* "[T]hus the commitment causes little additional harm in this respect." *Id.* Third, while hospitalized in a suitable mental health facility, Weed will receive psychiatric treatment based on the nature of his mental condition and the severity of his offense. *See Wattleton*, 296 F.3d at 1198–99 (citing 18 U.S.C. § 4247(a)(2)). Such medical treatment decreases the negative effect of confinement on Weed's liberty interest because it increases Weed's opportunity to overcome his present mental condition, thereby increasing the probability that the confinement will be ended.

*(2) The Risk of Erroneous Deprivation of Liberty Interest*

Addressing the second *Mathews* factor, Weed argues that a heightened

burden of proof directly increases the likelihood of an erroneous deprivation of his liberty interest. Aplt. Op. Br. at 17. It is undoubtedly true that the "more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision." *Cooper v. Oklahoma*, 517 U.S. 348, 362–63 (1996) (quoting *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 283 (1990)). Yet this fact is counterbalanced by the obvious point that the very nature of an insanity acquittal lessens the likelihood of an erroneous commitment since the defendant himself advances insanity as a defense, as compared to the involuntary civil confinement process.

For example, in *Jones v. United States*, 463 U.S. 354 (1983), the Supreme Court assessed the constitutionality of a congressional statute that set forth the civil commitment process for insanity acquittees in the District of Columbia. The Supreme Court stated that "Congress has determined that [an insanity acquittal] constitute[s] an adequate basis for hospitalizing the acquittee as a dangerous and mentally ill person." *Id.* at 364. Such an acquittal "supports an inference of continuing mental illness," *id.* at 366, and "there is good reason for diminished concern as to the risk of [erroneous confinement]." *Id.* at 367. Indeed, "[i]t comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment." *Id.* at 366; *see also Foucha v. Louisiana*, 504 U.S. 71, 76 (1992) ("[I]t

-17-

could be properly inferred that at the time of the verdict, the defendant was still mentally ill and dangerous and hence could be committed.").

Relying on these authorities, the Eleventh Circuit recently rejected an acquittee's claim that the risk of erroneous confinement is increased by § 4243's placement of the burden of proof on the insanity acquittee instead of the government. *See Wattleton*, 296 F.3d at 1199. The court noted that any risk of an erroneous decision is reduced because "a § 4243 hearing arises only after a jury finds a defendant not guilty by reason of insanity and only after all the procedural protections have been afforded the defendant in a criminal trial." *Id.* Thus, the court concluded that "the insanity verdict in and of itself supports the conclusion that the insanity acquittee continues to be mentally ill and dangerous." *Id.* at 1200.

In our case, the risk of an erroneous decision is reduced because Weed himself stipulated that he was not guilty of the murder of Robert Jenkins by reason of insanity. Thus, although a heightened burden of proof increases Weed's challenge of proving the absence of a present mental illness, we find that this fear is counterbalanced by his stipulation and the district court's finding of insanity, which supports the inference that Weed continues to be mentally ill and dangerous. The statute further mitigates the risk of error by allowing periodic evaluative hearings. 18 U.S.C. § 4247(h). Finally, habeas corpus review is unimpaired by the statute. 18 U.S.C. § 4247(g).

-18-

*(3)  The Government's Interest*

We now turn to the final  *Mathews*  factor, the government's interest.  The government clearly has a strong interest in protecting society from persons who pose a danger to others because of a mental disease.  *See Wattleton* , 296 F.3d at 1200.  Nonetheless, Weed maintains that this "admittedly weighty interest" does not justify imposition of a clear and convincing burden of proof on insanity acquittees because it effectively prevents release even when an acquittee more likely than not meets the statute's release criteria.  Weed argues that the higher burden of proof requires him to prove "to a high degree, something that is inherently elusive of such provability."  Aplt. Op. Br. at 19.  In other words, "future dangerousness is not a fact capable of proof with a high degree of accuracy."  *Id.*  In support of this proposition, Weed points to  *Cooper v. Oklahoma* , where the Supreme Court stated in the context of pretrial competency hearings that "the difficulty of ascertaining where the truth lies . . . does not justify the additional onus of an especially high standard of proof."  517 U.S. 348, 366 (1996).

Weighing the  *Mathews*  factors in this case, we conclude that the government's interest in safeguarding society justifies an elevated burden of proof for insanity acquittees seeking release from hospitalization and treatment.  It is precisely because future dangerousness is hard to predict that Congress could

-19-

reasonably conclude that insanity acquittees should not be released absent a heightened showing. Furthermore, the reasonableness of Congress's policy determination that the heightened standard reflects the degree of certainty society believes a judge should reach before releasing a criminally violent person who has been adjudicated insane is not seriously open to doubt.

The Supreme Court's *Cooper* decision is not to the contrary. In *Cooper*, the Supreme Court considered the constitutionality of an Oklahoma statute that presumed a criminal defendant was competent to stand trial unless the defendant could prove his or her incompetence by clear and convincing evidence. 517 U.S. at 350. Although it found that the Oklahoma statute violated due process, the Supreme Court specifically warned that civil commitment (and, by analogy, release hearings) and competency proceedings "address entirely different substantive issues." *Id.* at 368. The one, civil commitment proceedings, goes to the merits of whether a person is mentally ill and a danger to others; the other, competency proceedings, goes to whether the defendant has the present ability to understand the charges against him.

Additionally, the Supreme Court found in *Cooper* that Oklahoma had only a "modest" interest in the outcome of competency proceedings, *id.* at 365, whereas here, as noted above, the government has a significant interest in protecting the public from persons who have already shown they are a danger to others because

-20-

of a mental disease.  The Supreme Court found the state interest to be modest because, in the context of a competency proceeding, an erroneous determination that a defendant is incompetent "is subject to correction in a subsequent proceeding and the State may detain the incompetent defendant for 'the reasonable period of time necessary to determine whether there is a substantial probability that he will attain [competence] in the foreseeable future.'"     *Id*. (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (alternation in original).  Here, the potential consequences of an erroneous decision releasing an individual found not guilty of a serious crime by reason of insanity are potentially far more injurious to the state.

Therefore, although Weed will remain in custody even if he could hypothetically prove lack of dangerousness by a preponderance of the evidence, we do not believe Congress violated the Constitution by allocating the risk of error to the acquittee given the importance of the ultimate decision.     *See Addington*, 441 U.S. at 423.  For the foregoing reasons, we conclude that § 4243(d) does not violate Weed's due process rights.

### B.  Equal Protection

Nor does § 4243 violate equal protection because it places a higher burden of proof on insanity acquittees who commit crimes of a more serious nature.  As noted above, § 4243(d) requires an acquittee who commits an offense "involving bodily injury to, or serious damage to the property of, another person, or involving

a substantial risk of such injury or damage," to prove his release is warranted by clear and convincing evidence; whereas an acquittee who commits "any other offense" must prove eligibility for release by a preponderance of the evidence. 18 U.S.C. § 4243(d). We can dispose of this issue with relative dispatch as Weed's brief offers little analysis other than a conclusory assertion that the dangerousness of the criminal act does not justify a conclusion that the acquittee is more likely to be mentally ill in the future. *See* Aplt. Op. Br. at 20.

The Fourteenth Amendment mandates that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. "[T]he Fifth Amendment imposes on the Federal Government the same standard required of state legislation by the Equal Protection Clause of the Fourteenth Amendment." *Schweiker v. Wilson*, 450 U.S. 221, 226 n.6 (1981). With respect to distinctions between classes of individuals not deemed suspect or quasi-suspect or involving a fundamental right, equal protection "provides that a statute shall not treat similarly situated persons differently unless the dissimilar treatment is rationally related to a legitimate legislative objective." *Jurado-Gutierrez v. Greene*, 190 F.3d 1135, 1152 (10th Cir. 1999) (citing *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 457 (1988)).

Insanity acquittees are not members of a suspect or quasi-suspect class, nor

-22-

is a fundamental right at stake. *See Jones v. United States*, 463 U.S. 354, 363 n.10 (1983) (applying rational basis test to equal protection challenge to legal distinction between involuntary civil commitment and commitment of insanity acquittees). We therefore apply rational basis review and will uphold the statutory classification if it is rationally related to a legitimate government interest. *See White v. Colorado*, 157 F.3d 1226, 1234 (10th Cir. 1998). Construing Weed's allegation to assert that the distinction between classes of insanity acquittees fails this test, we find that § 4243(d) is in fact rationally related to a legitimate government interest. More particularly, we find § 4243(d) furthers the government's legitimate interest in protecting society from individuals who commit crimes involving bodily injury to another or serious property damage by requiring them to meet a higher standard of proof before being released than those who commit less serious crimes. Therefore, we conclude that § 4243(d) does not violate equal protection.

## III. The Merits of Weed's Appeal

Finally, Weed contends that the district court's finding that he is dangerous due to a mental disease or defect is clearly erroneous. He argues that although he had a brief psychotic episode in December 2001, evidence presented at the commitment hearing establishes that he was not currently suffering from a mental disease or defect. According to Weed, the district court's ruling was improperly

based on the possibility of future mental illness, not a finding of "present mental disease or defect" as required by § 4243. We disagree with Weed's assertion.

The district court's commitment determination under § 4243 is a question of fact we review for clear error. *United States v. Gilgert*, 314 F.3d 506, 512–13 (10th Cir. 2002). A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. De la Cruz-Tapia*, 162 F.3d 1275, 1277 (10th Cir. 1998) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). Our role on clear error review is "not to re-weigh the evidence; rather, our review of the district court's finding is 'significantly deferential.'" *Gilgert*, 314 F.3d at 515–16 (quoting *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 623 (1993)).

Section 4243(d) provides that an insanity acquittee "has the burden of proving by clear and convincing evidence that his release would not create a *substantial risk of bodily injury* to another person . . . *due to a present mental disease or defect*." 18 U.S.C. § 4243(d) (emphasis added). The Supreme Court observed that a verdict of not guilty by reason of insanity establishes two facts: "(i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness." *Jones v. United States*, 463 U.S. 354, 363 (1983). From these two facts, Congress reasonably could make "an

inference of continuing mental illness" and dangerousness of insanity acquittees, justifying their commitment for treatment. *See id.* at 366. However, such an inference does not last indefinitely. As the Supreme Court stated in *Foucha v. Louisiana*, an insanity acquittee "may be held as long as he is both mentally ill and dangerous, but no longer." 504 U.S. 71, 77 (1992).

As the parties here recognize, courts have provided little guidance as to when a psychiatric condition constitutes a "present mental disease or defect" under § 4243(d). *See United States v. Murdoch*, 98 F.3d 472, 478 (9th Cir. 1996) (Wilson, J., concurring) ("There is little guidance as to when a psychiatric condition falls within the scope of § 4243's mental disease or defect."). Rather, courts have generally expressed reluctance in applying medical criteria to legal concepts. *Id.* For example, in *Parrish v. Colorado*, we observed that "illnesses recognized by physicians to have a psychiatric basis sometimes do not equate with legal concepts defining mental states." 78 F.3d 1473, 1477 (10th Cir. 1996). Because the Colorado commitment statute challenged in that case "define[d], as a legal concept, the mental state an acquittee must have before he may be released from confinement," we concluded that "the test is not whether the medical state is medically definable, but whether the acquittee has a mental condition that fits the legal definition." *Id.*

Similarly, other circuits have cautioned against conflating medical or

-25-

diagnostic criteria with legal concepts when making determinations about an insanity acquittee's mental condition or a defendant's sanity. *See Murdoch*, 98 F.3d at 478 (Wilson, J., concurring) (observing that courts have expressed reluctance in relying on medical categories in determining limits of legal insanity, and finding one witness's testimony that personality disorders are not considered a mental disease or defect insignificant in making § 4243(d) determination); *United States v. Lyons*, 731 F.2d 243, 246 (5th Cir. 1984) ("[W]hat definition of 'mental disease or defect' is to be employed by courts enforcing the criminal law is, in the final analysis, a question of legal, moral and policy—not of medical—judgment.").

We agree that the proper approach in insanity cases is to focus on the legislative pronouncement embodied in § 4243. We conclude that on the basis of the record below, the district court did not err in applying the statutory criteria. First, at the commitment hearing, Dr. Grundy testified that although Weed did not currently meet any DSM-IV criteria for mental disease, Weed had suffered a mental defect which caused his psychotic disorder. None of the tests Dr. Grundy administered explained the cause of Weed's psychosis, nor could the tests predict whether Weed will have another onset of symptoms. Dr. Grundy testified that the recurrence of a brief psychotic disorder is rare; however, he conceded that the public is at greater risk from someone with a history of such episodes. Additionally, Dr. Grundy stated that Weed may still have the mental defect, but

that it has not been triggered since the time of the offense.

Second, Dr. Harrison Pope also testified that Weed is not currently psychotic. In his opinion, Weed's psychotic episode may have developed from a rare brain seizure, but he could not say with reasonable medical certainty that a seizure was the cause. Assuming a seizure caused the episode, Dr. Pope said that Weed is more vulnerable than the average person to having another recurrence of the seizure, but stated that the longer a person goes without having another seizure, the more the odds of recurrence are reduced. Dr. Pope agreed with the other consultants that Weed was dangerous when the psychotic condition was triggered.

Finally, the Bureau of Prisons (BOP) forensic evaluation offered a similar conclusion about Weed's current mental state. However, psychologists monitoring Weed's daily behavior viewed him as presenting a high risk of dangerousness if he relapsed into another psychotic episode, and stressed the risk of future recurrence is unknown. Thus, BOP recommended Weed be confined for a further period of observation, specifically concluding that "Mr. Weed is currently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damages to the property of another." (Appellant's Addendum of Exhibits, Exh. F).

Based on this evidence, we conclude that the district court did not err in

finding that Weed's mental state fits the legal definition in § 4243(d). Although Weed no longer shows symptoms of psychosis and meets no DSM-IV criteria for mental illness, the testifying doctors agree that Weed may still suffer from a condition not triggered since the time of the crime. The experts also agree that, if triggered, the condition may cause Weed to present a substantial danger to others. On this record, the district court did not err in concluding that such a condition constitutes a present mental defect within the meaning of the statute. [7]

We recognize the difficulty that continuing confinement presents for a person that no longer exhibits overt symptoms of mental illness. However, we may not re-weigh evidence presented at the commitment hearing and we must give significant deference to the district court's findings. *See United States v. Gilgert*, 314 F.3d 506, 515–16 (10th Cir. 2002). Given that two of the experts agreed that Weed would benefit from further observation and treatment, and considering the relatively short time period since the crime and his initial commitment, we are not

---

[7] Other circuits have addressed the issue of what constitutes a present mental defect. *Compare Murdoch*, 98 F.3d at 476 (rejecting argument that acquittee was not suffering from a present mental disease or defect because the evidence showed only that his condition might lead to violent activity in the future: "[the] argument erroneously focuses on the symptoms or side-effects of his mental disease rather than on the existence of the disease itself"), *with United States v. Bilyk*, 29 F.3d 459, 461 (8th Cir. 1994) (concluding district court clearly erred in finding acquittee suffered from mental disease or defect in light of "present diagnosis that the individual is not suffering from a mental illness, i.e., that the dangerousness risk factor is not due to mental disease or defect").

left with the definite and firm conviction that the district court has committed a mistake. Thus, the record compels us to hold that the district court did not clearly err in finding that Weed failed to demonstrate by clear and convincing evidence that his release would not create a substantial risk of danger to others due to a present mental disease or defect.

## IV. Conclusion

We hold that the clear and convincing burden of proof under 18 U.S.C. § 4243(d) does not violate the Due Process or Equal Protection Clauses of the Constitution, and that the district court did not clearly err in ordering Weed's continued confinement pursuant to 18 U.S.C. § 4243 (d) and (e). Therefore, we AFFIRM.